In the Interest of D.G.N., Jr.,
Respondent,

v.

S.M., Natural Mother, Appellant.

No. 66650.

Supreme Court of Missouri,
En Banc.

June 25, 1985.

As Modified June 28, 1985.

Hilda N. Petri, Columbia, for appellant.

Darwin A. Hindman, Jr., Columbia, for respondent.

WELLIVER, Judge.

Appellant, the natural mother of D.G.N., Jr., appeals from the order of the juvenile court terminating her parental rights to D.G.N., Jr.[1] The termination petition was brought pursuant to § 211.447.2(2)(e), RSMo. as amended 1982, which allows termination of parental rights to a child for serious injury and abuse to a sibling. Hearing on the petition was held in Boone County Circuit Court in April of 1983. The court terminated appellant's parental rights. The Court of Appeals, Western District, held that it was in the best interest of the child that parental rights be terminated, but the Court did not believe that the prior abuse of older siblings was sufficient under the statute to justify ter-

---

**1.** The original termination petition was filed against both the natural father and the natural mother. During trial the natural father's attorney consented to termination of the father's rights. The court invited a written consent which was never filed. The natural father has not appealed and therefore we do not address the termination as it relates to him.

mination of the parental rights to a child not *in esse* at the time of the abuse to the siblings. We transferred the case and consider the matter as on original appeal. Mo. Const. art. V, § 10. We affirm.

The incidents of abuse and injury to appellant's children J.M. and C.M. served as the basis for bringing this proceeding to terminate appellant's parental rights to her natural son D.G.N., Jr. The court of appeals having clearly, concisely and fairly described the events, substantial portions of their statement of facts are used without quotation marks. The mother and D.G.N., Sr. lived together with her two children by another father. The infant, D.G.N., Jr., was not yet born. The evidence indicates that after the mother moved in with D.G.N., Sr. representatives of Family Services began visiting her to investigate complaints of child neglect. These complaints varied in severity, ranging from allegations that she fed the girl sour milk, that the boy was left too long in wet pants, that both children were unattended, to complaints of faded bruises on the legs of the boy, bruises on his face, a swollen finger and other such incidents. The mother offered innocent explanations for each. Then, in July of 1980, the two adults left town for the night and entrusted the children with babysitters. The babysitters noticed that the boy could not urinate and that his groin was red and swollen. They took the boy and his sister to the hospital. After treatment, the children were released into the custody of their natural father, but shortly thereafter he relinquished them back to appellant. The complaints of child neglect and abuse, along with the visits from the representatives of Family Services, continued.

On January 15, 1981, the Division of Family Services obtained a warrant and with the aid of the police took the children from the mother and brought them to the Pulaski County Hospital for emergency medical treatment. The hospital suspected child abuse and referred the infants to the University of Missouri-Columbia Health Services Center. The officer in attendance at the hospital took photographs of the injured parts of the body of the boy and girl, and these representations were received in evidence and are a part of the file before this Court. These photographs depict very severe burns on the genitalia, thighs, lower buttocks and arm of the boy, and deep burns on the genitals and feet of the girl.

The children were examined and treated by a burn expert at the Health Center. He found both children small for their age. The boy was two and one-half years old, but bore the weight of a twelve-month-old—well below the fifth percentile. The girl was also below the fifth percentile in weight, and she was severely off scale for normal development.

An examination on January 17, 1981 of the mouth of the boy disclosed that it was unduly red and the tongue was glossy and swollen with ulcers around the corners of the mouth—indicia of a very severe malnutrition and vitamin deficiency. Further examination of the boy disclosed severe, full thickness [third-degree] burns on the scrotum and penis. A split thickness skin graft was required. The wounds were surrounded by dead tissue infected with bacteria. The boy suffered from a lung infection and fever as a consequence of the burns. The boy also displayed a deeply imprinted grillwork or tic-tac-toe burn on the right buttock. The wound was slightly infected, but healed without the necessity of a graft. The left buttock also bore scars. Additionally, the examiner found that the left third finger of the boy was infected and swollen from some sort of blow. The boy also displayed bruises on the forehead and ear.

The girl suffered from deep partial thickness burns on the tops of both feet. These wounds healed without the need for a graft. They were infected, however, from want of attention and she, too, suffered from a lung infection and fever. The child also displayed an old scar on the inner

thigh, a bruised left cheek and some bruises on the right buttock. The examiner acknowledged that the residual scars to the pubic area could represent a serious prolonged, unattended diaper rash.

An examining doctor concluded that the wounds and condition of malnutrition, as well as the general psychological misapprehension displayed by the children, were results of parental neglect. The malnourishment was simply from want of food. This point was strengthened by the evidence that the children recovered by regular feedings at the hospital. The redness around the mouth was also an indicia of malnutrition, evident for any parent to notice. In the course of the treatment, the children were withdrawn and did not react normally to other people. The boy was fearful of being held and cuddled. The doctor concluded that the scars on the children were permanent disfigurements. The injuries he examined and treated were very serious, and had they not received attention might have caused the loss of life. In all candor, this Court was struck by the serious injuries these two children sustained.

Although the mother virtually admitted the neglect, she denied the abuse and sought to explain these events. Suffice it to say that her explanations were incompatible with the conditions found by the doctor. Both the mother and D.G.N., Sr. plead guilty to charges of second degree assault for the abuse of the two children, J.M. and C.M. The adjudication of criminal abuse on the pleas was entered on December 22, 1981, and each was sentenced to a term of five years. Appellant and D.G.N., Sr. were married on August 30, 1982, but then divorced on February 14, 1983. While she was serving her sentence, appellant gave birth to her son D.G.N., Jr. on January 22, 1982. On January 27, 1982, the Juvenile Officer of Boone County filed a petition seeking transfer of custody of D.G.N., Jr. The child was ordered placed in the custody of the Department of Family Services. In March appellant was released on parole.

Then, on June 17, 1982, the Juvenile Officer filed a petition to terminate appellant's parental rights to D.G.N., Jr.

The Legal Assistant for the Juvenile Office at Boone County initiated the termination proceeding pursuant to § 211.447.-2(2)(e), RSMo. This section provides:

> The juvenile court may, upon a petition filed by the juvenile officer under this section, terminate the rights of parent to a child if it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

> (2) When it appears by clear, cogent and convincing evidence that one or more of the following conditions exist:

> (e) The parent has knowingly committed or knowingly permitted a single incident of life threatening or gravely disabling injury or disfigurement of the child or serious injury or death of a sibling due to parental abuse or willful and wanton neglect. . . .

In order to terminate the parental rights under this provision, the State must prove by clear, cogent and convincing evidence the abuse to the siblings. The State must also establish by substantial evidence that termination of parental rights would be in the best interest of the child.

The mother argues that however relevant the acts of abuse upon J.L.M. and C.D.M. may have been to terminate the parental right as to those children, they were not relevant in a proceeding to terminate the right to a child not yet born—a child not *in esse* at the time of the abuse and the injury to a sibling. She contends that the State may only terminate parental rights on the basis of conditions that exist in the home at the time of the hearing.

■ We believe the mother's argument overlooks the rationale for terminating parental rights pursuant to § 211.447.2(2)(e). The past abuse of another sibling is evidence of a home environment that is currently dangerous to the child for whom

termination is sought. Judge Higgins, in a slightly different context, aptly described the underlying rationale:

> The proposition that prior abuse of another child is a *prima facie* case of imminent danger to a sibling in the same circumstances to justify intervention by the court for removal of such child from his environment has been recognized and sustained in other jurisdictions. Cases such as this of maltreatment of a prior child present one of the few situations in which a juvenile court, and social agencies at its instance, can be alerted to take before-the-fact protective measures. The importance of court intervention in such cases, even though no damage to the second infant is manifest, lies in the knowledge that neglect or abuse by a parent with a propensity toward it is often triggered by the child's growth.

*In re A.A.*, 533 S.W.2d 681, 684 (Mo.App. 1976) (citations omitted). Judge Billings similarly observed that "past conditions, conduct and attitudes which may color, indicate, clarify or exist constitute the larger concept of the term 'present conditions.'" *Matter of C.W.B.*, 578 S.W.2d 610, 614 (Mo. App.1979). We do not believe that the actual physical harm must be present. "To require [the] child to suffer the fate of his siblings prior to termination of parental rights would be a tragic misapplication of the law." *In Interest of J.A.J.*, 652 S.W.2d 745, 749 (Mo.App.1983). It should also be noted that all grounds for termination must to some extent look to past conduct. Otherwise, a parent who has seriously abused or neglected a child at the time the petition is filed can always argue that since the filing of the petition he or she has reformed, such reformation usually purported to have occurred while the child is away from the parent.

This does not mean that the mother cannot present contrary evidence, which would tend to rebut the perceived danger to the child. The trial court might determine that the length of time between the abuse of the sibling and the termination petition is so long as to be of little evidentiary value. It might be that the State could not prove that the best interest of the child would be served by terminating parental rights when the abuse of the sibling no longer reflects the existing home environment.

■ Having concluded that § 211.447.-2(2)(e) establishes a proper basis for terminating parental rights, we now examine whether the trial court erred in terminating appellant's parental rights to D.G.N., Jr. In a court-tried case, the trial judge must decide that the evidence clearly, cogently, and convincingly demonstrates the existence of one of the conditions forming the basis for the termination petition. The judge must also determine whether termination would be in the best interest of the child, with the preference toward leaving the child with the natural parent. While the reviewing court must examine whether the trial court applied the correct standard of proof, "[d]ue regard is given for the opportunity of the trial court to judge the credibility of the witnesses and the decree will be sustained unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law." *In Interest of H.J.P.*, 669 S.W.2d 264, 270 (Mo.App.1984). *See also Juvenile Office of Cape Girardeau City v. M.E.J.*, 666 S.W.2d 957, 960 (Mo.App.1984).

■ The record leaves no doubt that the state proved its case by clear, cogent and convincing evidence. Substantial evidence existed for the trial court's determination that appellant inflicted or knowingly permitted the abuse or neglect of her natural children J.M. and C.M. The seriousness of the injuries to these children cannot be disputed. They will wear the scars of the abuse for the rest of their lives. The Family Services representative, the doctors, and now we can only describe this abuse as one of the worst ever observed. This abuse or neglect to J.M. and C.M. establishes, under

§ 211.447.2(2)(e), prima facie evidence of a home environment wholly unsafe for another sibling. We do not believe that because D.G.N., Jr. was not yet born when the abuse occurred, that the presumption of an unsafe home environment is dispelled. The mother was in prison while the child was born, and custody was taken from her about one year following the last incident of prior abuse of a sibling. The termination petition was filed shortly thereafter. Given the severity of the abuse, and the separation of the mother from her children which effectively served to negate the possibility of any further continuing abuse at the time D.G.N., Jr. was born, we do not believe that the interval between D.G.N., Jr.'s birth and the abuse of a sibling dispels the presumption of a home environment dangerous to D.G.N., Jr.[2] Any automatic rule that the child must be *in esse* at the time of the abuse to another sibling might lead to the unwarranted conclusion that a parent who kills one child and then gives birth to another child shortly thereafter could not have the parental rights to the remaining child terminated.

During the hearing on the petition, appellant presented testimony that since the birth of her son D.G.N., Jr. she has changed the pattern of her life. Various witnesses testified that appellant commenced to participate in Bible studies and had obtained gainful employment. Evidence was also presented that appellant would agree to work with the Division of Family Services and was saving toward acquiring a separate home for herself and her child. Additionally, appellant claimed that the man she was living with had committed the abuse of J.M. and C.M. and that she was no longer living with him. It was up to the trial court to assess this evidence and weigh the credibility of the witnesses in order to determine whether D.G.N., Jr. was, in fact, no longer in imminent danger

from an unsafe home environment. The trial court rejected the mother's plea and we decline to disturb its ruling. The substantial evidence of the savage abuse committed on J.M. and C.M. suggests a dangerous home environment and such evidence is not easily rebutted by proof of how witnesses expect the mother to behave in the future toward her child, especially when there is no evidence indicating an intervening normal parent-child relationship.

We are left, then, with having to determine whether substantial evidence existed for the trial court to find that termination was in the best interest of the child. Here, we agree with the court of appeals' conclusion that "the best interests of the child DGN, Jr. are served by the decree—that the child would be better off with someone other than the mother. The child and the mother have been separated from the time he was born in prison." The best interest of the child suggests he not be turned over to his natural mother from whom he has been separated for three and one-half years since his birth. We would add that these first three and one-half years that the child has spent in a parent-child relationship other than with his mother are among the most formative years in a child's development.

The very emotional plea of the mother's counsel that we ignore these standards of review and rules of law in order that she may be given another opportunity to present some two years of additional evidence of reforming conduct of the natural mother, moves the Court to address a matter relating to termination of parental rights long deserving of our attention.

This case brings into sharp focus what has long been recognized by many as the inherent weakness of the judicial system's ordinary procedures to deal with termination of parental rights—the natural de-

2. An Illinois appellate court recently held that proof of parental unfitness toward some children is sufficient to provide a basis for terminating parental rights toward all children, "even when the events all occurr[ed] prior to the birth of some of the children." *In Interest of J.R.*, 130 Ill.App.3d 6, 473 N.E.2d 1009, 1012, 85 Ill.Dec. 410, 413 (1985).

lay in arriving at a final determination. It is now over three years since the filing of the petition for termination, and we are still striving for a final determination. We have nothing here before us to indicate what part of the three and one-half years of time is attributable to appellant, or to respondent or to the inherent delays of the legal system while handling these matters in the same manner as all other civil matters. Of one thing we can be certain, every day that a child in its formative years is left in a stable parent-child relationship, natural or foster, the greater the potential for harm to the emotional well being of the child should it be necessary to order a change of custody.

We believe that the time has come for us to recognize that the awesome responsibility for dealing with termination of parental rights which has been placed on the courts requires that the courts in turn do all within their power to make the execution of this responsibility easier, fairer, faster and more in the best interest of the child. To this end, we direct that all future handling of termination of parental rights be expedited in every way possible and with all deliberate speed. This we believe should apply to the filing of responsive pleadings, to pre-trial procedures, to hearings, to preparation of transcripts, to docketing and disposition, and to briefing, hearing and decision in the appellate system. Only by so doing will it be possible to minimize the harm to children who must remain in limbo while the judicial system runs its course. We do not believe that this is too much to ask of lawyers, judges, the court and juvenile personnel.

Unfortunately for appellant, under the unique circumstances of this case she cannot escape the ramifications of the situation which she herself created. Regardless of what appellant's counsel believes she could now show, there is nothing before us to indicate that she was denied the right to show more at the time of the hearing.

The judgment of the trial court is affirmed.

HIGGINS, BILLINGS and DONNELLY, JJ., and GREENE, Sp. J. concur.

BLACKMAR, J., dissents in separate opinion filed.

RENDLEN, C.J., dissents and concurs in separate dissenting opinion of BLACKMAR, J.

GUNN, J., not sitting.

BLACKMAR, Judge, dissenting.

I dissent. I would reach the same result the Court of Appeals did, leaving the child in the custody of the Division of Family Services, but not finally terminating the mother's parental rights. I make use of some portions of the opinion of Judge Shangler in expressing my views.

Under the result reached by the principal opinion an adjudication of abuse or neglect to any sibling serves *per se* to terminate the rights of the natural parent to a child born subsequent to that adjudication. I do not believe that the legislature intended an automatic severance of the rights of the parent to a child not in being at the time of the prior sibling abuse, without regard to the parent's home environment at the time of attempted severance.

The ruling as it stands today has the effect of forever barring a parent convicted under § 211.447.2(2)(e), of retaining custody of a child born after the abuse of a sibling, without regard to subsequent rehabilitation. Such a result, as decisional authority suggests, only makes sense when the child is either in the same home environment at the time of the sibling abuse or when the same circumstances of abuse exist at the time of the termination hearing. *See In Interest of A.K.S.*, 602 S.W.2d 848, 851 (Mo.App.1980); *In re A.A.*, 533 S.W.2d 681, 684 (Mo.App.1976); *In Interest of J.A.J.*, 652 S.W.2d 745, 749 (Mo.App.1983). These two situations should be the only ones which establish presumptive proof of imminent danger to a sibling in order to justify termination of parental rights under

the above statute. It is illogical, however, to apply this presumption in a situation in which the child is not yet born at the time of the incidents of abuse.

In a proceeding seeking to terminate parental rights the state bears the full burden of proof on every element. *In the Interest of A.R.S.*, 609 S.W.2d 490, 491 (Mo.App.1980); *In Interest of W.F.J. and H.M.S.*, 648 S.W.2d 210, 214 (Mo.App.1983). Those elements should not merely relate to past conduct but should also relate to present conditions evincing a home environment which is in the child's best interests. As expressed in an early neglect proceeding, "[a]lthough evidence as to past conduct is material insofar as it may clarify and cast light on the present state of affairs, the right of parents to custody of their children must be determined with respect to existing conditions." *State v. Pogue*, 282 S.W.2d 582, 588 (Mo.App.1955).

Here, although the natural mother's past misconduct is material, it should not be dispositive of the ultimate custody determination. The state, rather, should have been required to adduce evidence of the home environment as it existed at the time of the hearing. Such evidence was notably absent. All questioning at the hearing concerned the neglect of the other children—neglect which transpired almost two years prior to the hearing and for which the mother had served a penitentiary sentence. The mother, as the principal opinion acknowledges, offered strong evidence of changed circumstances rebutting the potential danger to the child. The breach with her former husband, also convicted of abuse, is total, and he claims no parental rights. The state, however, never established that the present home environment was unsuitable or posed imminent danger to D.G.N., Jr. Absent such clear and convincing proof, I would reverse the judgment of the trial court terminating parental rights with custody remaining in the Division of Family Services, until the state meets its burden of proof under the statute.

Quite aside from the situation which existed at the time of the hearing, we must take note of realities. The case has now been in the judicial process for over three years. It is represented to us that the mother is in regular contact with the child. We should not curtly dismiss these representations with the observation that they are outside the record. Problems of child custody are never static. The principal opinion argues that the issue of custody should not be left in limbo. I agree, but I would not disqualify the mother as future custodian. In cases of this kind we should guarantee the child the best contemporaneous judgment as to custody. *See In Re Jeremy David Cook—Cook v. Cook*, 691 S.W.2d 243 (Mo. banc 1985), Blackmar, J., dissenting.

Inasmuch as no final order of custody has been made, it should be open to the juvenile authorities, even under the principal opinion, to receive an application for restoration of custody by the mother. I would not encumber the procedures with an affirmance of the judgment of the trial court.