**In the Interest of M.L.W., a Juvenile, Plaintiff,**

**JUVENILE OFFICER, Respondent,**

v.

**L.B., Natural Mother, Appellant.**

**No. WD 42338.**

Missouri Court of Appeals, Western District.

May 1, 1990.

---

4. Footnote 2, *supra*.

Robert G. Smith, Brookfield, for appellant.

John E. Casey, Pros. Atty., Brookfield, Gary E. Ravens, Guardian-ad-Litem, Marceline, for respondent.

Before SHANGLER, P.J., and CLARK and BERREY, JJ.

BERREY, Judge.

Appellant, L.B., the natural mother of M.L.W., appeals from an order terminating her parental rights to M.L.W.[1] The termination petition was brought pursuant to § 211.447.2(3), RSMo 1986. Appellant presents two points on appeal: (1) that the trial court erred in ordering the termination of parental rights because there was no clear, cogent and convincing evidence to find that L.B. could not provide the proper care and support for the child and that there was little likelihood that the conditions leading to the assumption of jurisdiction could be remedied; and (2) that the trial court erred in ordering termination as there was no clear, cogent and convincing evidence to support the finding that the Linn County Division of Family Services had used reasonable, diligent and continuing efforts to aid L.B. in rectifying the conditions which caused M.L.W. to come under the jurisdiction of the court. Affirmed.

M.L.W. is a female child born on July 22, 1985. She has been under the jurisdiction of the Linn County Division of Family Services (DFS) since September 19, 1986. On September 12, 1986, Tammy Eastin contacted the office of the DFS. Eastin, the girl-friend of appellant's oldest son, was caring for appellant's two children R.H.[2] and M.L.W. Eastin was concerned because she had no money and the gas and electricity were about to be shut off. The children had been left with her while L.B. attended a truck driving school near Kansas City, Missouri. Appellant requested that the children be placed with the DFS. Initial placement of M.L.W. was with Mrs. Juanita Caruthers, but she was later placed with Doug and Vicki Reeter. She was still residing with them at the time of the hearing.

L.B. found employment as a truck driver but that employment was terminated when L.B. was arrested in November, 1986, on a bad check charge. She pled guilty to a felony charge of passing bad checks on February 9, 1987. On March 2, 1987, she pled guilty to a charge of second degree arson. She was subsequently incarcerated in the Chariton County jail in Keytesville and then transferred to the Adair County jail and later to the State Correctional Facility in Chillicothe, Missouri. From this facility L.B. was eventually transferred to the St. Mary's Honor Center in St. Louis, Missouri, where she stayed until her parole on August 26, 1987.

L.B. was in contact with the DFS while she was living at the Honor Center. A court approved plan was executed by L.B. to be in effect from June 27, 1987, through December 22, 1987. In this plan she agreed to obtain employment, establish a home for herself and M.L.W., visit M.L.W. once a month, and pay support when she was able. She did not comply with the requirements of the plan. While at the Honor Center, appellant worked at a sample garment company earning approximately $120 per week, although the Honor Center took approximately half of her earnings. During this time she paid no support to anyone for the care of M.L.W. After her release, L.B. worked for the sample garment company until September when she changed jobs, moving to Franklin County to work at Tri–County Truck Stop

---

1. The natural father, M.W., consented to the termination of his parental rights prior to the hearing.

2. R.H. has now reached the age of majority and is not a subject of this appeal.

where she made $2.25 per hour and $50–$100 per day in tips. Her case was transferred to Franklin County where Mark Taylor, a DFS worker, was assigned to her case. Supervised visits were set up between L.B. and M.L.W. on January 7, January 8, February 25, April 7, and April 18, 1988. Through the DFS she received counseling and a psychiatric evaluation.

On February 25, 1988, a meeting was held with L.B. concerning permanency planning. At that meeting L.B. said that she was living in Villa Ridge, Missouri, and was in the process of changing jobs. She indicated that she planned to stay in Franklin County. However, in April 1988, L.B. moved once again, this time to Shelby County to do work as an informant with the Missouri Highway Patrol, a job which only paid expenses. She also got a job at a nursing home there at not much more than minimum wage. At a review hearing, held June 7, 1988, L.B. was asked about the support that she had paid. Although she professed willingness to support M.L.W. and her son, L.B. had spent a total of twenty dollars for their support from September of 1986 up to the time of this hearing. Another court approved plan was entered into by L.B. and the D.F.S. on June 13, 1988. In this agreement L.B. agreed to maintain stable employment, establish a stable permanent home, visit M.L.W. once a week, pay support averaging $25 per week and participate in counseling.

Everything went well for approximately a month and a half. L.B. participated in counseling sessions, visited regularly with M.L.W. and paid $105 in support. L.B.'s past caught up with her, however. She testified at a preliminary hearing against an accomplice in a case involving burglary and murder. Her testimony was detailed in a newspaper article dated August 24, 1988. She was identified by name in the article, and as a result L.B. absconded without notifying the DFS where she could be reached.

L.B.'s parole was revoked due to her leaving Shelby County. She was eventually incarcerated at the Fulton Reception and Diagnostic Center where she remained until February 18, 1989. After her release L.B. moved to Moberly in Randolph County, Missouri, where she resided at a rooming house.

During the period that L.B. was incommunicado, L.B. remarried but separated from her husband after one day of marriage. She has been married seven times. Two of her children were fathered by men other than her husbands.

A petition to terminate L.B.'s parental rights to M.L.W. was filed December 18, 1988. A hearing on the petition was held on March 8, 1989, a few weeks after L.B.'s release from Fulton. The trial court ordered that L.B.'s parental rights be terminated. From this order, L.B. appeals.

Appellant first contends that the trial court erred in ordering termination of L.B.'s parental rights as there was no clear, cogent and convincing evidence to support the finding that L.B. could not provide the proper care, support and supervision for M.L.W. Appellant claims that the trial court erred in concluding that the conditions leading to the assumption of jurisdiction still exist and that there was little likelihood that the conditions which led to the assumption of jurisdiction could be rectified in the foreseeable future.

The termination proceeding in the instant case was brought pursuant to § 211.447.2(3), RSMo 1986, which provides:

2. The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer, if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

.    .    .    .    .

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be re-

turned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child; ....

▮ The primary concern in any termination of parental rights is the best interests of the child. *In Interest of M.E.W.,* 729 S.W.2d 194 (Mo. banc 1987). The state must prove its case based upon clear, cogent and convincing evidence. *D.G.N. v. S.M.,* 691 S.W.2d 909, 912 (Mo. banc 1985). Due regard must be given to the trial court's opportunity to judge the credibility of the witnesses. *Id.* The decree must be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence or it erroneously declares or applies the law. *Id.* Review is done in the light most favorable to the trial court's order. *In Interest of M.E.W., supra,* 729 S.W.2d at 196.

▮ Appellant would have us view this case in a very narrow time frame. Her argument of trial court error hinges upon the three week period from the time of her release from Fulton to the time of the termination hearing. She points to her residence in the rooming house at Moberly and her employment there. Appellant conveniently forgets her past. Although no one can predict the future with total accuracy, patterns in the past provide vital clues to the present and the future. The events of the past shape the future. "It should also be noted that all grounds for termination must to some extent look to past conduct."

*D.G.N. v. S.M., supra,* 691 S.W.2d at 912. Anyone can be a saint for short periods of time. To allow only review of very recent events is both short sighted and dangerous. The court in *D.G.N.* points out, for example, what could be the consequences of such a policy where it states, "a parent who has seriously abused or neglected a child at the time the petition is filed can always argue that since the filing of the petition he or she has reformed, such reformation usually purporting to have occurred while the child is away from the parent." *Id.*

Appellant chose the life of a nomad. In the two and one-half years this case has been pending L.B. never established a stable home having resided at fourteen different locations. She chose to be an infrequent visitor in the life of her daughter, leaving her to attend a truck driving training school and moving from county to county between periods of incarceration.

Appellant made little attempt to comply with the court approved plans she agreed to. *See In Interest of M.B.,* 768 S.W.2d 95 (Mo.App.1988). Her support of the child was minimal and token. Her lifestyle was one of frequent marriages, none of which were of long term duration. Zeyep Daugherty, a clinical psychologist called by L.B. as a witness, testified that while L.B. might have tried to maintain a stable lifestyle, "after a while, after six months or so, she got tired of it or she couldn't handle the pressure and she went back to her normal ways." Even the time period that appellant focuses on, the time between her leaving Fulton and the time of the termination hearing, provides no support for her position. L.B. made no attempt to contact M.L.W. She did not contact anyone with the DFS about visiting with M.L.W.

It is obvious that there was clear, cogent and convincing evidence in support of the trial court's determination that the conditions leading to an assumption of jurisdiction still exist and that there is little likelihood of these conditions being remedied in the foreseeable future. Appellant's Point I is denied.

In Point II, appellant claims that the trial court erred in terminating her parental rights to M.L.W. because there was no clear, cogent and convincing evidence that the Linn County DFS used reasonable, diligent and continuing efforts to rectify the conditions which caused M.L.W. to come under the jurisdiction of the court. Appellant points to § 211.447.2(3)(a) and (b), RSMo 1986, which state that the court shall consider, "[t]he terms of a social service plan entered into by the parent and the division...." and "[t]he success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis...." The trial judge did indeed make such findings, stating that the DFS "used reasonable, diligent and continuing efforts to aid the natural mother to rectify the conditions which caused the child to come under the jurisdiction of the Court...." The trial court went on to find that these efforts were not successful because L.B. did not cooperate.

"Although the statute requires the court to consider the terms of a social service plan, it also requires an affirmation duty on the part of a parent to support, communicate and visit the children and to show that the parent is committed to the child by showing an interest." *In re Interest of A.L.B.*, 743 S.W.2d 875, 881 (Mo.App.1987). It was not the DFS that was derelict in their duties to L.B., rather L.B. was derelict in her duty to M.L.W.

Initially, Linn County took jurisdiction of M.L.W. In addition to Linn County, however, the DFS offices in Livingston, Shelby and Franklin counties were involved in the case. Linn County co-ordinated the efforts of these other counties. A Permancy Planning Review Team was formed and met twice. Psychiatric and counseling services were provided appellant in Franklin and Shelby counties. DFS workers made home visits to appellant. There is sufficient evidence in the record to support the trial court's findings on the matter. Any failing of the DFS, either real or imagined, cannot excuse L.B.'s own actions and neglect of her duty. "[T]he statute does not require any particular standard of treatment or services. Even the absence of treatment or services is no defense to a termination proceeding." *In re Interest of A.L.B.*, 743 S.W.2d 875, 881 (Mo.App.1987).

Nor is there any merit in L.B.'s contention that the DFS engaged in a pattern of conduct from the outset designed to terminate her rights. There is ample evidence in the record that termination was not thought to be in the best interest of M.L.W. at one time during the case. This, coupled with the efforts made by the DFS to aid L.B., totally refute such a contention. Appellant's Point II is denied.

The judgment of the trial court is affirmed.

All concur.