**In the Interest of D.D.H.**

**STATE of Missouri, Petitioner–Respondent,**

v.

**GLENDA P., Respondent–Appellant.**

No. 18764.

Missouri Court of Appeals,
Southern District,
Division Two.

March 22, 1994.

Motion for Rehearing or Transfer
Denied April 12, 1994.

Application to Transfer Denied
May 26, 1994.

James R. Sharp, Wear, Nelms & Sharp, Betty A. Pace, Springfield, for respondent-appellant.

Kay A. Van Pelt, F. Richard Van Pelt, Van Pelt & Van Pelt, P.C., Springfield, for petitioner-respondent.

FLANIGAN, Presiding Judge.

On January 28, 1993, Glenda P., age 21, gave birth to a son, D.D.H. ("D"). On March 10, 1993, the county juvenile office filed, in the Juvenile Division of the Circuit Court of Greene County, a petition alleging that D was in need of care and treatment and the services of the court. The court issued an order placing D in the temporary legal custody of the juvenile authorities and appointed a guardian ad litem for the child. On April 13, 1993, following an evidentiary hearing, the court entered an "Order for Temporary Legal Custody," finding that D was within the court's jurisdiction under § 211.031.1(1),[1] that the allegations of the petition were true, and that D was in need of the care, protection and services of the court. The court ordered that D remain in the temporary legal custody of the Greene County Office of the Division of Family Services. Glenda appeals.

Section 211.031.1(1) reads, in pertinent part:

[T]he juvenile court . . . shall have exclusive original jurisdiction in proceedings:

(1) Involving any child . . . who may be a resident of or found within the county and who is alleged to be in need of care and treatment because:

(a) The parents, or other persons legally responsible for the care and support of the child . . . neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his well-being; . . .

(b) The child . . . is otherwise without proper care, custody or support.

Glenda presents the following two points, which will be considered together:

1. The trial court erred in finding D to be within its jurisdiction under § 211.031.1(1) because there was no substantial evidence that Glenda neglected or refused to provide proper care for D or that D was otherwise without proper care in that: (a) at the time D was removed from the home, he was normal and healthy and there was no evidence that he was subjected to neglect or abuse while in the care of Glenda or the child's father with whom Glenda was living, and (b) Glenda was undergoing extensive counseling and utilizing services while she and the father had custody of D, thereby rectifying the conditions which had previously led to the removal of D's half-sibling from Glenda's care and Glenda's voluntary placement with her grandmother of another half-sibling of D.

2. Even if the trial court had jurisdiction over D, the order of removal was improper because there was no evidence that D was not able to be returned to the home, in that Glenda and the child's father were receiving counseling and parenting advice and aid from the juvenile authorities, and at the time of D's removal he was a normal healthy child who was not subjected to any form of abuse or neglect.

The judgment from which Glenda appeals, although a temporary order and subject to modification, is appealable. *In Interest of M.D.S.*, 837 S.W.2d 338, 339[1] (Mo.App. 1992). The judgment is reviewed pursuant to the standards established under Rule 73.-01(c) and *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The evidence and all reasonable inferences therefrom will be considered in the light most favorable to the trial court's order. *In Interest of J.M.P.*, 669 S.W.2d 298 (Mo.App.1984); *In re B.G.S.*, 636 S.W.2d 146, 148[2] (Mo.App.1982).

In a juvenile court hearing, the court, in the adjudicatory phase, determines if the evidence presented establishes that the child comes under juvenile court jurisdiction. If so, the court proceeds with the dispositional phase and receives evidence regarding the disposition or treatment that should be or-

---

1. All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

dered for the juvenile. *In re Interest of K.S.,* 856 S.W.2d 915, 916 (Mo.App.1993); Rule 119.02(a)(9).

▆ The standard of proof in a hearing on a petition which alleges as a basis for jurisdiction that the child is in need of the care and protection of the juvenile court is clear and convincing evidence. *In Interest of L.J.M.S.,* 844 S.W.2d 86, 92[6] (Mo.App. 1992); *In Interest of A.L.W.,* 773 S.W.2d 129, 131 (Mo.App.1989); Rule 117.05(b).

The evidence supports the adjudication of jurisdiction under the petition by proof clear and convincing that [the child is] in need of the care and protection of the juvenile court. It is not essential to such an adjudication that the court find the condition of neglect dangerous, but only that the parent failed to provide that minimum quality of care the community expects and tolerates.

*In Interest of A.L.W.,* 773 S.W.2d at 132.

▆ The finding of jurisdiction under § 211.031 need not be based on direct evidence. *In Interest of W.J.D.,* 756 S.W.2d 191, 196. (Mo.App.1988). The trial court, functioning as a fact finder, may draw all reasonable inferences from the evidence presented to it and may base its findings upon such reasonable inferences. *Id.* The paramount consideration is the welfare of the child. *C.R.K. v. H.J.K.,* 672 S.W.2d 696, 698[5] (Mo.App.1984); *In re A.A.,* 533 S.W.2d 681, 684 (Mo.App.1976).

The petition of the juvenile officer alleged, in essence: D resided in Greene County with Glenda and D's father; D's welfare is endangered in that he is in a condition of potential abuse or neglect by the behavior of Glenda, in that Glenda, in October 1990, "agreed to the guardianship of her child [K, who was born February 28, 1990]"; On February 24, 1992, M, a sibling of D, was subjected to an act of physical abuse consisting of a spiral fracture of the right humerus when the sibling was under one year of age and in the custody of Glenda; Glenda has a pattern of abuse or neglect of children who are less than one year of age, and D would be subjected to some form of inappropriate care by Glenda.

At the evidentiary hearing of April 13, the juvenile officer and Glenda appeared in person and by counsel, and the guardian ad litem appeared. By stipulation, the court received into evidence certain investigative reports, the probate records in the guardianship of K, and the juvenile records in the abuse proceeding of M.

The record in the guardianship proceeding showed that K was born February 28, 1990. On July 19, 1990, K's maternal grandparents filed a petition to be appointed guardians. The court found that the natural father of K was unknown, that Glenda was the natural mother, and that Glenda was incapable of caring for K. Glenda signed a waiver of right to be appointed and consented to the appointment of petitioners as guardians.

The juvenile records reflected that Glenda had no explanation for the breaking of M's arm on February 23, 1992, when M was two months old. X-rays revealed a spiral fracture of the humerus. On May 14, 1992, after an evidentiary hearing, the court assumed jurisdiction of M under § 211.031.1(1). The evidence showed that Glenda began prostituting at age 15 and began using cocaine at age 16. M was placed in foster care.

Another exhibit showed that on February 23, 1992, M, in addition to the fracture of the humerus, had bruises on her face, her buttocks, and her spine. Glenda stated that the facial bruises were "from M sleeping on her hand." The admitting physician explained to Glenda that the facial bruises were not so caused. Glenda stated that the bruises on M's buttocks were birth marks. Records showed M had no Mongolia spots at birth. Glenda initially denied that she had broken M's arm. In December 1992, Glenda admitted to her therapist that she had caused the fracture. Glenda later made the same admission to social worker Vicki Music.

With regard to D, the juvenile officer introduced the records of Cox Medical Center showing that on March 13, 1993, D was admitted for "suspected child abuse." The record recited: "[D] is a two-month-old that was just taken away by D.F.S. from his mom for report of child abuse. Apparently somebody called and said that the mom was shaking the

baby inappropriately and he has since been taken away from her care.... There are no bruises or other markings of any kind on the skin.... Although [D's] exam was normal today, this does not rule out child abuse as the exam can sometimes be normal with history of abuse. D has a small bump on forehead and behind ears."

Witnesses for the juvenile officer were G. Berschler, Norma Mashburn, and Vicki Music. Their testimony included the following:

**G. Berschler:** I am employed by the Ozark Area Community Action Corporation and I am the parent aide for Glenda. I was asked to go into the home a couple of weeks before D was born to teach Glenda parenting skills and bonding. Glenda would refer to the dog as her baby and the cat as the baby of D's father. Glenda referred to D as "it." They—Glenda and D's father—were not holding D while feeding him. I did not want them to prop the bottle. When D woke up crying, Glenda didn't give him a bottle. She gave him a pacifier which didn't satisfy him. When I suggested she give him a bottle, she delayed doing so for three or four minutes. When I went in on a Friday, D was hoarse and I asked Glenda if she had been letting D cry. Glenda said she let D cry "itself" to sleep on Wednesday. I told Glenda that children who aren't bonded are the ones who become serial killers and Glenda told me her personality was the same as a serial killer. I gave Glenda booklets on child care. I did not see a typical parent-child bond between Glenda and D. When I was there [on one occasion] the father was watching D, who was asleep on the couch. When he woke up, Glenda did not come to D. Glenda petted the dog and talked to the cat and never did talk to D. She did not express enormous affection for D or show dedication to him.

**Norma Mashburn:** I am a registered nurse with the County Health Department. In February 1993, I visited the home at the request of D.F.S. I was concerned that there were several cats in the house and D was sleeping in the bed with Glenda and the father. On February 8, 1993, I visited the home. Glenda was holding D, who had just awakened. I thought D was hungry and suggested she feed him, and Glenda said,

"He's hungry every time he wakes up." She did fix him a bottle after my third suggestion. D's diaper was dirty and he was wet. I asked Glenda two or three times to change him before she did. Glenda did not hold him up in her arms as bonding with him. Glenda said she felt she didn't have any time for herself and she was tired of being home all the time by herself. Glenda did not want to hold D. On February 18, 1993, I visited the home. Glenda was most stressed with D being ill and·crying so much. Glenda was more concerned about the fact of not having time for herself, that she was with him 24 hours a day. Glenda said the day before she got upset when D got so irritable and she felt better after she walked into the other room. On February 22, 1993, I visited the home. Glenda was still not bonding as well with D. On March 1, 1993, I noted that Glenda did not hold D and called him "it." Glenda said she needed to go to work to get out of the house and that being in the house 24 hours a day was stressful to her. Glenda admitted having injured M. She said that due to the pressure in her life, trying to take care of M, it was too much pressure when she was tired and that led to the breaking of the arm. My real concern was Glenda's coping with the frustration of D's crying and knowing how to handle him when no one else was around. I voiced my concern to D.F.S. When anybody came in the house, Glenda handed D to them, regardless of who it was.

**Vicki Music:** I am a social worker with the D.F.S. and I am Glenda's treatment worker. Glenda told me she was engaged in prostitution when M was brought into care in February 1992. I was the case worker for M when D was removed. I was concerned about D's welfare at the time he was removed. G. Berschler and Norma Mashburn told me they were concerned about what was happening at the house. Glenda was not complying with directives. Glenda was feeding D banana food and he was a newborn. We decided we would have to have very close communication because D would be at high risk. There was fear of Glenda not being as open about her frustrations. Based on my knowledge of the care and my interviews with Glenda and the father, I have the same

concern today that I voiced earlier about D's welfare. The reason D was removed initially was an anonymous hotline call. The call was a shaken baby and being slapped, and that was unsubstantiated. I believe D to be at risk of injury if he was returned to Glenda's home at this time. We are going to have D seen by an apnea specialist and a neurologist. The foster parents report that D has periods where he screams. Because D is such an extremely difficult baby to deal with, whether he was prenatally drug exposed or not, I believe he will be at high risk because of the low frustration tolerance of Glenda and the father.

D's guardian ad litem, an attorney who participated in the hearing, recommended that the trial court assume jurisdiction.

Glenda did not testify at the hearing. Her two witnesses were Frank Bartlett and D's father. Their testimony included the following:

**Frank Bartlett:** I am a self-employed clinical psychologist and I have been seeing Glenda and D's father in family therapy since September 1992. They were referred to me by D.F.S. Glenda has always struck me as a person having a history of being more severely abused and neglected than even she would acknowledge. She has adopted a lifestyle that includes a lot of anti-establishment and anti-authority elements. Glenda admitted to me that she broke M's arm. Glenda has less tolerance for frustration than most of us. If a baby is crying continuously, she, more than most of us, would want to get out of that situation. This is not quick and easy therapy; this is long-term. There are a lot of things that still are to come. I think Glenda's potential for injuring D is less than it was for M because I think she has looked at a lot of issues. She is genuinely motivated to change her life. She is involved with a man who is helping her to do that. These are factors which lead me to believe she would be less likely to be injurious to a new child. Having observed Glenda and the father with D, I do not feel that D is at high risk for injury. Glenda comes from a very bad background. It is appropriate for people to be concerned about her. I still have concerns. I am not convinced that Glenda is the

perfect parent by any stretch of the imagination. My main concern is that they may not last as a family. Glenda has a very difficult time with intimate relationships. She has a difficult time not keeping things very superficial. She has a way of prodding D's father. These things are aggravating. I have a lot of concern that this family won't last. I have a concern that should that be the case she would become more frustrated and therefore more of a risk with D. I think that's a real possibility. I have continuing concerns about Glenda's antisocial behavior, that ingrained personality trait. She is probably capable of being a very manipulative individual. I do not feel that D would be at high risk, but I do not hold the opinion that D would not be at risk at all. Glenda has a very difficult time dealing with frustration. They are at the low level of the economic totem pole and that's a very frustrating situation. I don't think anybody would say that D would be in no risk of being abused. Glenda needs continued treatment and counseling. If it is true that Glenda would have people over in order for them to care for D and would never hold D and would continually give D to other people, that would concern me.

**D's father:** I have lived with Glenda since December 1991. I was living with her when M was removed. That injury occurred because Glenda was under a lot of stress from her job and trying to take care of "them." Glenda also had some calls from her ex-boyfriend, M's father. After she got the phone calls, she was so stressed she picked M up and probably grabbed her too quick. I was in the bedroom and didn't actually see.

■ Prior abuse of another child is prima facie evidence of imminent danger to a sibling in the same circumstances so as to justify intervention by the court for removal of the sibling from his environment. *In Interest of W.J.D., supra,* 756 S.W.2d 191, 196 (Mo.App.1988); *In re A.A.,* 533 S.W.2d 681, 684 (Mo.App.1976). See also *In re Interest of A.K.S.,* 602 S.W.2d 848, 851[7] (Mo.App. 1980).

In *In re A.A., supra,* the court said, at 684:

Cases such as this of maltreatment of a prior child present one of the few situa-

tions in which a juvenile court, and social agencies at its instance, can be alerted to take before-the-fact protective measures. The importance of court intervention in such cases, even though no damage to the second infant is manifest, lies in the knowledge that neglect or abuse by a parent with a propensity toward it is often triggered by the child's growth.

The foregoing language was quoted with approval in *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo.banc 1985).

Indeed, in *In re Interest of A.L.B.*, 743 S.W.2d 875, 882 (Mo.App.1987) the court said:

> The courts of this state have not been hesitant to terminate parental rights of a child when a sibling has been abused. *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985) quoting *In Interest of J.A.J.*, 652 S.W.2d 745, 749 (Mo.App.1983). ('To require a child to suffer the fate of his siblings prior to termination of parental rights would be a tragic misapplication of the law').

In *In Interest of C.L.M.*, 625 S.W.2d 613 (Mo. banc 1981), an appeal by the natural mother from a judgment encompassing an adjudicatory determination under § 211.031, the court said, at 616:

> Nor must the juvenile court stand idly by in the face of a situation recognized as potentially harmful to the emotional well-being of a child and await the child's emotional destruction before attempting to protect the child from an injurious and harmful environment. . . .
>
> .      .      .      .      .
>
> It should be noted that the mother's parental right has not been terminated and that she has rights of visitation which are being exercised. Termination under § 211.447, RSMo 1978 is distinct from custody transfer under § 211.181, RSMo 1978; the latter is not irreversible and is subject to modification or termination.

There was clear and convincing evidence that Glenda, on February 23, 1992, severely abused M, then two months old. The abuse consisted of inflicting a spiral fracture of the humerus and other injuries.

The testimony of G. Berschler, a child care expert, Norma Mashburn, R.N., and Vicki Music, a social worker, is significant. Each of them had knowledge of the conditions which existed in Glenda's home during the period between D's birth and the filing of the petition six weeks later. From that testimony and the rest of the evidence, the trial court could properly conclude, as it did, that D was in a position of clear and present danger and was subject to its jurisdiction under § 211.031.1(1). Glenda's first point has no merit. The evidence also justified the trial court's order of removal. That order is subject to modification or termination under Rule 119.09, and Glenda may at any time petition the court in writing for such relief. Glenda's second point has no merit.

The judgment is affirmed.

PREWITT and GARRISON, JJ., concur.