## In the Interest of P.J.M., E.C.M. and J.W.M., Minors.

No. 68976.

Missouri Court of Appeals, Eastern District, Division Three.

July 16, 1996.

Lisa K. Lange, Kevin L. Wibbenmeyer, Dickerson, Rice, Spaeth, Heisserer and Summers, John D. Harding, Limbaugh, Russell, Payne and Howard, Cape Girardeau, for appellant.

Chris N. Weiss, Lichtenegger, Payne and Weiss, Jeffrey P. Dix, Guardian Ad Litem, Jackson, for respondent.

GERALD M. SMITH, Presiding Judge.

Parents appeal from the judgment of the trial court terminating their parental rights in three of their children. We affirm.

At the time of trial the parents had seven children. The eldest was born in December 1984. For convenience and anonymity we will designate the children by numbers 1 through 7 with 1 representing the eldest. Numbers 2, 3, 4, and 7 are girls. Numbers 6 and 7 are twins. Numbers 5, 6, and 7 are involved in this proceeding.

None of the children were in the custody of either parent at the time of the hearing. The parental rights of the parents had been terminated as to Numbers 3 and 4 in Orleans Parish, Louisiana. The reason for those terminations was neglect and abandonment. Numbers 1 and 2 were originally removed from the home in May 1987, when the parents were arrested and charged with kidnapping and sexual assault of a fourteen year old girl. The charges were later dropped because of unwillingness of witnesses to testify. Number 2 was never returned to the parent's custody. Number 1 was returned in September 1993 to his mother and in short order went from an honor student to a discipline problem. He was subsequently removed from mother's custody in September 1994. Numbers 6 and 7 were born in late May 1994. Because of mother's treatment of Number 7 that child was taken into custody by Mississippi county juvenile authorities on June 10, 1994, and after a hearing on June 21, 1994, at which mother admitted the allegations of the petition, Number 7 was adjudicated neglected and placed in foster care. In July of that year Number 7 was returned to her mother. On September 15, 1994, after mother tested positive for drugs at a safe house, the four children in her custody, Numbers 1, 5, 6, and 7 were taken into custody by the juvenile authorities.

After petitions were filed in September 1994, alleging the children involved here were in need of care and treatment, orders were issued by the juvenile court assuming custody and placing the children with the Division of Family Services. No hearing was held. Instead petitions for termination of parental rights were filed with regard to each child in April, 1995. Hearing was held on June 6 and 7 and the court entered its order terminating parental rights to Numbers 5, 6, and 7 on August 1, 1995.

In father's first point he contends that the requirements of § 211.447.2(2) RSMo 1994 were not met in that there had been no prior adjudication of abuse or neglect as to the children involved in this proceeding. *In the Interest of P.M.*, 801 S.W.2d 773 (Mo.App. 1991)[3] and *In the Interest of D.L.D.*, 701 S.W.2d 152, 158 (Mo.App.1985) both hold that the statute contemplates two hearings. The first is to establish abuse or neglect and the second to terminate parental rights.

We find the requirement of those cases has been met here. As to Number 7, the hearing and finding in Mississippi county satisfies the statutory requirement. Number 7 was found to be neglected after hearing. The ground of neglect as a basis for terminating parental rights is established by showing the child has been adjudicated neglected. It is not necessary to show the parents to have been neglectful. *In the Interest of D.L.C.*, 834 S.W.2d 760 (Mo.App.1992)[3].

As to Numbers 5 and 6 (and for that matter 7) the hearing and adjudication in Louisiana of neglect of Numbers 3 and 4 is sufficient to support the termination here. Under Missouri law termination of parental rights can be based on a severe act or recur-

rent acts of physical, emotional, or sexual abuse toward the child or any child in the family by the parent. § 211.447.2(2)(c). The reasoning for this is stated in *D.G.N. v. S.M.*, 691 S.W.2d 909 (Mo.banc 1985)[1] as follows:

> We do not believe that the actual physical harm must be present. "To require [the] child to suffer the fate of his siblings prior to termination of parental rights would be a tragic misapplication of the law." (Quoting from *In the Interest of J.A.J.*, 652 S.W.2d 745, 749 (Mo.App.1983)).

The records from the Louisiana proceeding reflect that father hit three month old Number 4 while striking at the mother, knocking the child to the ground. While attempting to avoid apprehension, the child and mother fell from an automobile operated by father and the child was taken to the emergency room. The court in Louisiana found that both Numbers 3 and 4 had been abandoned and neglected by their parents and on that basis terminated parental rights. More of the factual details involving the Louisiana situation appear *intra*.

*In the Interest of D.G.N.*, *supra*, the court stated the following policy that courts in Missouri must:

> [D]o all within their power to make the execution of this responsibility easier, fairer, faster and more in the best interest of the child. To this end, we direct that all future handling of termination of parental rights be expedited in every way possible and with all deliberate speed.... Only by so doing will it be possible to minimize the harm to children who must remain in limbo while the judicial system runs its course. We do not believe that this is too much to ask of lawyers, judges, the court and juvenile personnel. [l.c. 914].

It would be difficult to find a case where the expeditious handling of termination proceedings is more strikingly called for than this one. While the statutory requirements must be met, where the purpose behind the statutory requirements has, in fact, been achieved, hyper-technicality in the interpretation of the statute is not required. Here the neglected status of the children of these parents has been determined in two different proceedings in two different states. The

family had been involved with one or more county or parish juvenile offices for eight years prior to the hearing. Each of the seven children had been the subject of juvenile office intervention. It is hyper-technical at best to delay the necessary termination, and the hopefully brighter future for these children, so that a court may have another hearing to determine that these specific children have received the same injurious treatment as their siblings.

Father further contends that he did not receive proper summons before the September 1994 orders were issued. Since these orders are not being considered as determinations of abuse or neglect the point is without merit.

■ Both parents challenge the sufficiency of the evidence to support the findings upon which parental rights were terminated. We will regretfully highlight some of the evidence upon which the findings were made.

As stated the parents have seven children with the oldest born in December 1984. The New Madrid County Division of Family Services (DFS) first became involved with the family in December 1986. Number 2 was then two months old. A report had been made that Number 1 was improperly supervised and was inappropriately bruised. The parents entered into a written service agreement to ensure proper medical care for Number 2 and appropriate discipline for Number 1.

In May 1987, Numbers 1 and 2 were removed from the home because the parents were arrested and charged with the kidnapping and sexual assault of a fourteen year old girl. This charge was eventually dropped because key witnesses would not testify. Number 2 was never returned to the parents custody. After removal of the two children from the home the parents moved to Louisiana, where Numbers 3 and 4 were born.

The Orleans Parish Office of Community Services became involved with Numbers 3 and 4 due to a referral on August 12, 1990, some three months after the birth of Number 4. This was based on a report that mother was having oral sex with the patrons of a

bar. Father arrived at the bar and had an altercation with mother during which he struck Number 4 as previously stated. When the mother and child arrived at the emergency room after the fall from the car, mother shouted obscenities and spit on emergency room personnel. The Orleans Parish records reflect the parents were also involved with the Office of Community Services in Plaquemines Parish, where both parents engaged in drug abuse and fighting and where both parents had been in jail.

Sometime in 1991 the parents moved back to Missouri leaving Numbers 3 and 4 in Louisiana. They had no further contact with the children. Their rights to Numbers 3 and 4 were terminated in April 1993. Number 5 was born in August 1991. In September 1991, a preventive service file was opened concerning him. Number 1 was returned to mother's custody in September 1993 on condition that mother cease contact with father. Mother did not comply with this condition.

In March 1994, mother moved to Mississippi County and on May 27, 1994, the twins, Numbers 6 and 7 were born prematurely. The pediatrician at the hospital reported that father came to the hospital and stated that he didn't want little girls in his house. There was concern that mother would be unable to care for the children properly because they were on heart monitors and mother seemed to prefer the male twin. The hospital also alleged that the mother fabricated an illness, stating that the twins turned purple, when the records indicated no such problem. As a result, Number 7 was taken into custody by the county on June 10 resulting in the neglect adjudication previously discussed.

In June 1994, father made several verbal threats to Mississippi county DFS employees, including threats of injury to their children. In July 1994, Number 7 was returned to her mother on the condition that father not be allowed in the home. On July 8, mother reported to a county employee that she had been physically and sexually assaulted by father the night before. On August 5 she reported to the same worker with a large swollen lip and stated that father had taken her to a railroad track and physically and sexually assaulted her. Arrangements were made for her to enter a safe house in Cape Girardeau at some future time.

On August 15, East Prairie police began an investigation regarding events occurring on August 5th through 8th. During that period mother reported that father tied her up with venetian blind cords and assaulted her by repeatedly raping her, beating her on the back with a belt, inserting a baseball bat in her vagina, placing a cattle prod covered with a rubber glove in her vagina while shocking her five times, and cutting her on the belly with a razor blade. Mother told the police that father wanted to make sure she was not pregnant and would not have another female child. She also reported that the physical and sexual abuse had been occurring in their marriage for nine years. A search of the premises where the assault allegedly occurred revealed venetian blind cords, a baseball bat, a rubber glove, and a bottle of baby oil which mother had also described. Mother at that time had custody of Numbers 1, 5, 6, and 7, and all four were at home when the alleged assaults occurred.

When arrested father blamed others for the assault and stated that he did not care what charges mother made, she would not follow through with them. At the termination hearing mother stated that she fabricated the whole story and that her injuries were self-inflicted. When she arrived at the safe house she had a stab wound in her side and was hemorrhaging from her vagina. At that time she attributed the vaginal bleeding to being shocked with a cattle prod. She also related past abuse including being raped, shot, stabbed, and of attempts to cut her throat and to cut off her arm. While at the safe house mother made no progress on goals established for her. She did not press charges against father, she disobeyed house rules, and had problems with parenting skills including threatening the children by telling them that she was going to put them in foster care.

There was evidence that the children were aware of the abuse and of the fact that father would tie mother up to abuse her. There was evidence that the parents were involved in satanic worship and sacrificed animals in front of the children. Number 1 told safe

house employees that he had witnessed such sacrifices. Mother admitted such practices and of giving Number 1 a drug after sacrifices to cause him to forget the occurrence.

Mother left the Safe House on one occasion, went to a district fair, and left Number 1 unattended there. When she returned to the safe house the employees suspected she had been taking drugs. When she tested positive she was asked to leave and the children were taken back into custody by DFS.

After leaving the safe house mother had at least five residences within three months. In December, 1994, she was found with a gunshot wound to her abdomen which she subsequently said was self-inflicted. She was admitted to a mental health center which she left without permission. She was readmitted after threatening to kill herself.[1]

The parents have been arrested in Missouri at least six times for offenses ranging from kidnapping to drug offenses. Both have substantial histories of drug abuse. Both have made attempts at suicide. Both have received treatment for mental disease. Both have been diagnosed as having antisocial personality disorder. Expert testimony defined that condition as applying to persons having blatant disregard for social norms and standards; persons who set their own guidelines in life and disregard the established rules in society. It was the conclusion of experts that neither parent has any resources to draw from to make them suitable as parents. One expert considered them untreatable except possibly for drug abuse. He testified that their prognosis is poor and made an unequivocal recommendation for termination of parental rights.

Our concern, and that of the juvenile court, is the best interests of the children. § 211.447.2. The evidence demonstrates conclusively that neither parent here has the mental health, emotional maturity or inclination to be a satisfactory parent. The court properly terminated their parental rights to these three children.

Judgment affirmed. Motion for attorney's fees and expenses on appeal by mother's attorney is granted in the amount of $819.23.

GARY M. GAERTNER and RHODES RUSSELL, JJ., concur.

---

**1.** Mother was pregnant at that time. She also was smoking marijuana when she entered the hospital.