**In the Interest of J.M., (a Male Minor), Plaintiff.**

**and**

**JUVENILE OFFICER, Respondent,**

**v.**

**D.M.M., (Natural Mother), Appellant.**

**No. WD 42222.**

Missouri Court of Appeals, Western District.

April 24, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 29, 1990.

Edward M. Berg, Columbia, for appellant.

Elton W. Fay, Columbia, for respondent.

William A. Mallory, Columbia, for plaintiff.

Before NUGENT, C.J., FENNER, J., and WASSERSTROM, Senior Judge.

FENNER, Judge.

D.M., the natural mother, appeals from the order of the circuit court terminating her parental rights to her son, J.M.

Initially, it is noted that the points raised by D.M. necessitate a detailed recitation of the facts, which cover over a six year time period. The petition for termination of parental rights alleges that J.M. was born on September 2, 1982, to D.M., then single, and W.G. D.M. and W.G. never married. W.G. has agreed to the termination of his parental rights. On March 9, 1984, D.M. voluntarily placed J.M. in the care of Division of Family Services (DFS) and entered Crossroads Rehabilitation Center in Fulton, Missouri, for drug abuse. On May 14, 1984, J.M. became a ward of the Boone County Juvenile Court and was placed in the care of Mary Sue and Clyde Bea, his paternal aunt and uncle. J.M. has remained with the Beas' continuously and exclusively since that time.

On February 14, 1984, prior to entering Crossroads, D.M. was convicted of forgery and sentenced to three years, but her sentence was suspended with five years of supervised probation. D.M. failed to complete the rehabilitation she began on March 9, and was arrested again on March 19, 1984, but was released on her own recognizance. At this time, visits with J.M. were set up on a weekly basis. On March 28, 1984, D.M. was placed in the Boone County Jail due to a positive drug test. She bonded out of jail on April 5, 1984.

On April 13, 1984, D.M. was placed at the McCambridge Center, an alcohol rehabilitation center in Columbia, Missouri. While residing in the McCambridge Center, D.M. was observed to have fresh needle marks on her hands and demonstrated slurred speech. D.M. was discharged from the center on April 25, 1984, for not returning timely. D.M. absconded from supervised probation from the end of April until September, 1984, when she was arrested and returned to the Boone County Jail.

During the time of her disappearance, D.M. was in Las Vegas where she gave birth to twins and gave them up for adoption to a couple in California. D.M. sent one letter to her son and made four telephone calls to DFS regarding her son over

that six month period. When D.M. was returned to the Boone County Jail, she was not allowed visits due to her continued drug use while incarcerated.

D.M. was sentenced to prison on October 15, 1984. She was incarcerated at Renz Correctional Center from October 23, 1984, until November 27, 1984, when she was transferred to Chillicothe Correctional Center (CCC), where she remained until June 5, 1985. During this time D.M. had one visit with J.M. in March and one in April. D.M. was released to the Kansas City Honor Center on June 5, 1985, but tested positive for drug use upon admission. D.M. was returned to CCC July 16, 1985, after having three violations at the Honor Center. She remained this time at CCC from July 16, 1985, to March 3, 1986. Upon D.M.'s return to CCC and pursuant to court order visitations were to take place once a month while D.M. was at CCC. Accordingly, visitations took place the months of August, October, December, January and February.

D.M. was released to Kansas City Community Center (KCCC) on March 3, 1986. Her next visit was scheduled for April 12, 1986, but had to be cancelled when she called DFS speaking in a slurred voice, stating that she and her boyfriend had a flat tire. She did not know where she was and she could not listen to instructions or follow directions.

On April 14, 1986, during a bed check at KCCC, it was discovered that D.M. had escaped. She was found and arrested in Jefferson City on August 14, 1986. During her disappearance she had no visits with her son. D.M. was taken to CCC September 2, 1986, and requested visits to resume in that month. However, between September, 1986 and February, 1987, apparently due to several different complicating factors, such as a shift in DFS personnel, visitation was hampered and delayed.

On February 24, 1987, visits resumed. The February visit was held in a smoke filled room which allegedly caused J.M. to become ill on the way home, that is to become feverish and to vomit as the child is prone to chronic bronchial infections. The March visit had to be postponed and the next was held in April, 1987. The May visit was cancelled as D.M. was placed in "the hole" due to a prison violation. Thereafter, visits took place in June, July, August, September and October of 1987.

D.M. was released from CCC on November 24, 1987, but had no contact with DFS or J.M. until January 15, 1988, when she informed DFS that she had moved to Mattoon, Illinois, to live with her parents. Pursuant to D.M.'s request, a visitation schedule was arranged. D.M. attended a Permanency Planning Meeting on February 29 and March 3, 1988, wherein a reunification plan was established which was agreed to by D.M. D.M. could also have additional visits beyond those set forth in the plan should she so request.

The petition for termination of parental rights was dated February 3, 1988. The cause was set for hearing March 21, 1988, but the transcript before this court indicates that hearings on the petition were held July 29, 1988, August 26, 1988, October 14, 1988 and finally, June 6, 1989. A wealth of evidence was adduced in the form of testimony and exhibits regarding what transpired between D.M. and J.M. during visitation, how D.M. conducted herself in prison and other background information as it relates to D.M.'s ability to care for J.M. Following the hearings the trial court ordered D.M.'s parental rights terminated.

In her first point D.M. avers that the trial court erred in finding that the statutory grounds set forth in § 211.447.2(3), RSMo 1986, exist, namely that a condition of a potentially harmful nature continued to exist and that there is little likelihood that the condition will be remedied at an early date. D.M. also argues that the evidence presented by the state to show that she had a chemical dependency did not meet the statutory requirements because it was not shown that she, on a consistent basis, was unable to provide the care needed for her son due to such dependency and

that her dependency cannot be treated to enable her to properly care for her son.

The paramount concern in a parental rights termination case is the best interest of the child. A violation of one or more statutory grounds for termination must be established by clear, cogent and convincing evidence. Section 211.447.2, RSMo 1986. *In Interest of M.B.*, 768 S.W.2d 95, 97 (Mo.App.1988). Deference is given to the trial judge's determination of the credibility of witnesses, and the judgment will be overturned if there is no substantial evidence to support it, if it is contrary to the evidence or if it erroneously declares or applies the law. *Id.* This court is bound to examine all the facts in the light most favorable to the trial court's order. *In Interest of M.E.W.*, 729 S.W.2d 194, 194–96 (Mo. banc 1987).

Contrary to her allegations, the evidence viewed in the light most favorable to the order supports the finding that a condition of a potentially harmful nature continued to exist and that there is little likelihood that the condition will be remedied at an early date so that J.M. could be returned to D.M. Likewise, there was ample evidence in the record from which the trial court could find, as it did, that the condition referred to, chemical dependency, prevents D.M. from consistently providing the necessary care, custody and control over J.M. and which dependency cannot be treated so as to enable her to consistently provide such care, custody and control. In a nutshell, the facts as previously set forth, indicate that for the period of time J.M. has been under the jurisdiction of DFS, D.M. has consistently shown irresponsibility and unpredictability, e.g., absconding from prison supervision on more than one occasion, being under the influence of alcohol or drugs while incarcerated on more than one occasion, thus preventing visits with her son. D.M. has failed, for some six years to establish a stable environment for her son and has presented no evidence of any effort to do so. In fact, there was no testimony in the record from D.M. concerning what she has done since her release from prison. The best evidence of this would have been D.M. herself, but she was not in attendance the day of the final hearing when she was to testify, allegedly because she had been assaulted the night before and was on pain medication so that she could not stay awake.

This court is not unmindful of the fact that D.M. expresses that she loves her son, but the test is not what is in the best interest of the mother. The test rather is what would be in the best interest of J.M. The evidence indicates that he is now bonded, and has been for some time, with his foster parents who wish to adopt him. On the contrary, the court found, in accordance with the evidence, that the child is not bonded with his mother. The record reveals that the continuation of the parent-child relationship would greatly diminish J.M.'s prospects for early integration into a stable and permanent home.

D.M. takes issue further in her point II with the trial court's order alleging that the court failed to follow the mandate of § 211.447.2(3) in that the court did not consider and make findings as to the items listed in subparagraphs (a) through (d) of that section. The portions of the statute in issue are as follows:

2. The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer, if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

\* \* \* \* \* \*

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an

early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court *shall* consider and make findings on the following: (emphasis added.)

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control.

A review of the trial court's order reveals that the court did make a finding as to subparagraph (d) regarding the chemical dependency. The trial court did not, however, make findings as to subparagraphs (a), (b) and (c). This court is not in a position to overlook the clear statutory mandate that "the court *shall* consider and make findings ..." as to subparagraphs (a) through (d). § 211.447.2(3), RSMo 1986. The cause must therefore be remanded to the trial court with directions that the trial court consider the record herein and enter findings upon said record with respect to subparagraphs (a) through (c) of

§ 211.447.2(3). In the event that the subject matter of any of said subparagraphs is not relevant to the disposition of this cause a finding should be made to that effect stating why a given subparagraph is irrelevant, (e.g., no evidence presented, insufficient evidence presented, evidence not credible, etc.).

At this point, it may be helpful to distinguish the case of *In re H.K.*, 762 S.W.2d 465 (Mo.App.1988), cited by respondent. In that case this court was called upon to determine whether proof of any one of the four factors listed in subparagraphs (a) through (d) of § 211.447.2(3), RSMo 1986, was sufficient for termination of parental rights. In response, this court held that the factors listed in subparagraphs (a) through (d) are not separate grounds for termination, but are categories of evidence to be considered together with all other relevant evidence, and that proof of only one listed factor did not preclude termination of parental rights. *In re H.K.*, 762 S.W.2d at 469. Although in that case it appears that the trial court therein had made findings only as to subparagraphs (a) and (b), the issue raised therein was not whether the trial court is required to make findings as to (a) through (d) as is raised herein, and is thus clearly distinguishable.

■ In point III, D.M. alleges that it was error for the trial court to justify termination of her parental rights based upon the finding that there is a lack of emotional ties between D.M. and her son. She vehemently attacks DFS, alleging the lack of emotional ties between herself and her son were caused by the failure of DFS to provide visitation required by court order, by the failure of DFS to provide reasonable efforts to maintain the family and by the failure of DFS to stop the foster parent from destroying the parent-child relationship.

This court agrees with respondent, Juvenile Officer, that contrary to D.M.'s assertions, the involvement of DFS in this case was comprehensively to the contrary. Rather, the record reflects that DFS, for

some seven and one half years, has worked with all parties involved to facilitate the relationship between D.M. and J.M. The record also reflects that the trial court was correct in finding that there was a lack of emotional ties between D.M. and her son. This finding was not, however, used as a justification for termination as characterized by D.M.

D.M. offers her opinion, in great detail, as to how she believes DFS could reform its procedure to better aid incarcerated parents. While her suggestions may be well taken by someone, they are irrelevant herein.

The facts are that J.M. has been in foster care since March, 1984, and has been with his current foster parents since May, 1984. The record indicates that since that time numerous visits were scheduled, but that the child does not now, nor has he since a short time after he was placed in foster care, exhibit a bond with his natural mother. It is unnecessary to go into great detail describing the many instances wherein J.M. has evidenced this lack of emotional bond. This lack is not the fault of DFS.

The sentiment of this court as to the situation herein can best be described by the language used by Judge Lowenstein in *In Interest of M.B.*, 768 S.W.2d 95, 97 (Mo.App.1988), wherein he stated:

> [The child] now has a chance to have real but not biologically natural parents. The evidence here is the child does not know her mother, but has become attached to those who have provided the day to day care for her and wish her to be their own. This court is unwilling to overlook [appellant's] failure to meet her obligations as a parent. This child deserves a break and her chance for a family comes not a moment too soon. The child has a continuing, healthy and stable foster care situation and adoption offers a chance for permanency and quality attention in a family situation. The chance for harm to the child by removing her from a haven of emotional well-being should not here be taken. *D.G.N. v.*

*S.M.*, 691 S.W.2d 909, 914 (Mo. banc 1985).

Because there was sufficient evidence of a lack of emotional ties between D.M. and J.M., point III is overruled.

In her fourth and final point, D.M. alleges that the trial court erred in terminating her parental rights because the Juvenile court failed to hold yearly dispositional hearings pursuant to § 210.720, RSMo 1986. D.M.'s reliance on this section is misplaced.

Section 210.720 relied on by D.M. requires a dispositional hearing to be held within eighteen months of initial placement in the custody of an authorized agency and that hearings be held annually thereafter. In sum, the purpose of the dispositional hearing is to determine whether the child should remain in foster care. This section however, applies where a child has been taken into custody or into foster care by a court.

In the present situation, D.M. voluntarily committed J.M. to the custody of DFS. Thus, § 210.710, RSMo 1986, applies. Under § 210.710, RSMo 1986, dispositional hearings are discretionary with the trial court. It cannot be said that failure to hold dispositional hearings in this case was an abuse of discretion.

In view of the foregoing, with regard to D.M.'s points I and II, the cause must be remanded with directions that the trial court enter findings as to subparagraphs (a) through (c) of § 211.447.2(3), RSMo 1986. Her points in all other respects are overruled.

All concur.