**In re the Interest of F.L.M., M.S.M., T.S.W., C.D.W., and B.M.W., juveniles.**

**Nos. 59439–59443.**

Missouri Court of Appeals, Eastern District, Division Three.

Oct. 20, 1992.

Richard J. Eisen, Lawrence G. Gillespie, St. Louis, for appellant.

Elizabeth Jane Redmond, St. Louis County Juvenile Court, David Allyn Shaller, Clayton, for respondent.

STEPHAN, Judge.

G.M.W. ("Mother") appeals from the trial court's order, judgment and decree, which terminated her parental rights. We affirm.

Mother has five children: a son, F.L.M., born December 19, 1978; a daughter, M.S.M., born March 11, 1980; a daughter, T.S.W., born May 5, 1981; a son, C.D.W., born September 18, 1983; and a son, B.M.W., born May 13, 1985. The father of the three older children, J.W., died August 31, 1980. The father of the two younger children, C.M., was also a party to the trial court proceeding. The trial court similarly terminated his rights.

On February 8, 1987, all five children were placed with DFS for foster care. On February 11, 1987, the Juvenile Officer filed a petition for each of the five children alleging that they were without proper care, custody and support. On April 21, 1987, the Juvenile Officer amended T.S.W.'s petition to add two new allegations. Specifically, the Juvenile Officer alleged that T.S.W. was without proper care in that she was the victim of both rape and sodomy, in that she was subjected to sexual intercourse and deviate sexual intercourse by C.M., an adult resident of T.S.W.'s household. The Juvenile Officer amended each child's petition, one last time, on May 27, 1987.

After a hearing on the petitions and amendments, the trial court found all allegations to be true. On June 16, 1987, the court placed each child under the court's

jurisdiction. Specifically, the trial court placed legal custody of each child with the Division of Family Services ("DFS"), with visitation rights and temporary physical custody granted to Mother as arranged by DFS. The trial court ordered DFS to submit to it a service plan for Mother within 30 days. The trial court also ordered the State to pay the cost of maintenance for the children in foster or residential care. The trial court found that DFS had made reasonable efforts to prevent or eliminate the need for placement and to reunify the family prior to June 16, 1987.

Mother and DFS agreed to a service plan on September 24, 1987. They reduced the agreement to writing, which both parties signed. The court approved this plan on September 28, 1987. The stated goal of the plan was to help Mother regain physical custody of her children. The plan required Mother to visit with her children at least twice per month, obtain housing for herself and her children, obtain both a psychological and a psychiatric evaluation, obtain drug and alcohol counseling, obtain employment or employment training, provide a daycare plan, make support payments on behalf of her children if so ordered by the court, meet with a social worker once per month and keep her social worker informed of changes in address, telephone number, job or individuals with whom Mother lived. The final paragraphs of the plan indicated that if Mother did not fully comply with her plan, or if the plan was unsuccessful, she might permanently lose her parental rights to her children. The final paragraph also indicated that if Mother did not reasonably comply with the plan and the children were under the court's jurisdiction for a year or more, DFS might ask that her parental rights be terminated and her children placed up for adoption, thereby preventing her from ever seeing her children again.

Since 1987, B.M.W. has remained in non-relative foster care. The other four children's living arrangements have changed. On March 8, 1988, C.D.W. was transferred to the Salvation Army Hope Center, where he remains. On October 5, 1988, M.S.M. and T.S.W. were transferred to relative foster care, where they remain. On March 10, 1989, F.L.M. was transferred to relative foster care, where he remains. The three relatives with whom the three oldest children were placed have expressed a desire to adopt the children. B.M.W.'s foster family has also expressed a desire to adopt him. The Salvation Army Hope Center is still seeking adoptive placement for C.D.W.

Carolyn Schmaltz was Mother's DFS worker from June 16, 1987 until the termination trial. Mother has minimally complied with her service plan. Between January 11, 1988, and June 1990, Mother has missed seventeen scheduled visits with her three older children. During this same period, she has missed twenty-seven visits with her two younger children. Mother did not inform Schmaltz that she had obtained appropriate housing for herself and the children. Although Mother did obtain both psychological and psychiatric evaluations in 1987, Mother refused to obtain further evaluations that were authorized in March 1990. Moreover, Mother failed to obtain counseling.

Mother minimally complied with the employment provision. Mother worked at St. Louis Temporaries from July to September, 1988. She also worked at Swiss American Import for one month, in September 1989. Additionally, Mother worked at JCMF Industries from October to December, 1989. Although Schmaltz repeatedly requested a list of places where Mother had sought employment, Mother failed to provide such a list. Mother enrolled in one job training program, however, she never completed the program due to repeated hospitalizations for drug abuse. Schmaltz gave Mother a list of ten separate job referral programs on five separate occasions. Mother apparently did not do anything with this information.

Because Mother has failed to seek employment, there was no need for her to provide a daycare plan for the children. The court has never ordered Mother to make any support payments on her children's behalf.

Finally, Mother has minimally complied with the requirement that she meet with

Schmaltz. From September 1987 to May 1990, Mother met with Schmaltz fourteen times. We note, however, that the plan requires Mother to set up monthly meetings with her social worker. Mother has not done so. Instead, Schmaltz would request the meetings after mother met with her children. Mother never even once formally requested a meeting with Schmaltz. Moreover, Mother failed to keep Schmaltz apprised of her whereabouts. Between February 8, 1987, and May 11, 1990, there were eleven different occasions when Schmaltz did not know Mother's whereabouts. Other than time spent in hospitals, Mother had at least eight different addresses, moving between relatives' and friends' homes, when she was not homeless.

Between the time the children were placed in foster care on February 8, 1987, and May 11, 1990, Mother was hospitalized at different St. Louis area hospitals seventeen times for drug abuse. Specifically, Mother was hospitalized for abusing cocaine, phencyclidine ("PCP") and marijuana.

On May 11, 1990, the Juvenile Officer filed petitions on behalf of each of Mother's five children. In each petition, the Juvenile Officer alleged that: (1) the children had been adjudicated abused or neglected; (2) the children had been under the court's jurisdiction for a period of at least one year; and (3) the continuation of the parent-child relationship greatly diminished their prospects for early integration into a stable and permanent home. In the petitions filed on behalf of the two youngest children, the Juvenile Officer additionally alleged that Mother had abandoned them without good cause and for a period of six months or longer prior to the filing of the termination petitions.

At the outset of the termination trial, Mother's appointed trial counsel, Rick Eisen ("Eisen"), requested a continuance. Eisen stated that although he had made attempts to get together with Mother, she would not cooperate with him. Specifically, Eisen stated that Mother: failed to appear at a meeting with him, refused to come to his office, and insisted that she had

her own personal attorney. Eisen confirmed that Mother had sought independent counsel, but Mother also failed to keep her appointment with this attorney.

The trial court denied Eisen's motion, stating that he had been her attorney for approximately two months. The trial court asked Mother if she wanted to proceed on her own or with Eisen's help. Mother requested Eisen's aid. The cause proceeded to trial. During Mother's testimony, she explained that she was not asking for custody of her children at this time, but wanted another year to try and obtain her children.

After a three-day trial, the trial court took the case under submission. On November 5, 1990, the trial court terminated Mother's parental rights with regard to all five children. Mother currently appeals from this decision. We will recite additional facts, as necessary, throughout the remainder of this opinion.

■ Mother's first point is that the trial court erred in terminating her parental rights with regard to her five children, based on her chemical dependency. Specifically, Mother contends that the trial court misapplied the law in that it found that Mother's prognosis was poor, while §§ 211.447.2(2)(b) and 211.447.2(3)(d) require consideration of a parent's chemical dependency when it cannot be treated.

The paramount concern in a parental rights termination case is the best interests of the child. *In Interest of J.M.*, 789 S.W.2d 818, 821 (Mo.App.1990). A violation of one or more of the statutory grounds for termination must be established by clear, cogent and convincing evidence. § 211.447.2, RSMo 1986; *In Interest of J.M.*, 789 S.W.2d at 821. Deference is given to the trial judge's determination of the credibility of witnesses. *Id.* The trial court's decision must be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* We are bound to examine all of the facts in the light most favorable to the trial court's order. *Id.* Moreover, if any one ground for termination is

supported by the evidence, the termination may stand. *In Interest of R.H.S.,* 737 S.W.2d 227, 236 (Mo.App.1987).

Section 211.447.2(2)(b) provides in pertinent part:

2. The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer, if it finds that the termination is in the best interests of the child when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

* * * * * *

(2) The child has been adjudicated to have been abused or neglected. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following acts of the parent:

* * * * * *

(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control; . . . .

Contrary to Mother's allegations, the evidence viewed in the light most favorable to the order supports the findings that Mother's chemical dependency prevents her from consistently providing the necessary care, custody and control of her children. The evidence also indicates that Mother's chemical dependency cannot be treated so as to enable her to consistently provide such care, custody and control. Between February 8, 1987 and May 11, 1990, Mother was hospitalized at different St. Louis area hospitals seventeen times for drug abuse. Mother's hospital records are replete with examples that Mother was consistently under the influence of cocaine, PCP and marijuana.

This court is not unmindful of Mother's claim that during the trial, there was evidence that her chemical dependency could be treated. In theory, any chemical dependency can be treated. However, the record is uncontroverted that, although Mother has been admitted to hospitals seventeen times for chemical dependency, she has never been treated for this persistent condition. In fact, the hospital records are replete with statements from Mother that she has no condition which requires treatment.

Parents must make a commitment to change the course of their conduct which prevents the return of their children. *In Interest of R.H.S.,* 737 S.W.2d 227, 236 (Mo.App.1987). DFS cannot be expected, nor is it legally authorized, to physically force a parent to obtain the necessary help. *In Interest of W.D.T.,* 785 S.W.2d 286, 291 (Mo.App.1990). However, for a period of over three years, Mother has failed to make a commitment to change the course of conduct, drug abuse, which prevents the return of her children. Neither the courts nor DFS can force Mother to obtain the help that she needs.

We note, before turning to Mother's second point, that Mother did testify that she refrained from using illegal drugs from March 1990 until trial. The trial court, however, was free to reject such testimony. The trial court properly terminated Mother's parental rights, with regard to all five children, since: (1) the trial court found that termination was in the best interests of each child; and (2) it appears by clear, cogent and convincing evidence that: (a) Mother has a chemical dependency which prevents her from consistently providing the necessary care, custody and control of her children; and (b) Mother's chemical dependency cannot be treated so as to enable her to consistently provide such care, custody and control. Mother's first point is, therefore, denied.

Mother's second point is that the trial court erred in terminating Mother's parental rights with regard to her five children. Specifically, Mother contends that the trial court's findings that she failed to: (1) provide her children with appropriate care necessary for their health and development; (2) comply with the service plan; and (3) adjust her circumstances or conduct to provide a proper home for her children, are without substantial evidence and are against the weight of the evidence since:

(a) the Juvenile Officer demonstrated that Mother was neither physically nor financially able to provide for her children; and (b) the trial court made no finding with regard to the propriety of the service plan (a prerequisite to determining that Mother failed to comply with said plan). Mother, additionally, contends that she substantially complied with the plan. Finally, Mother contends that the Juvenile Officer failed to establish that her situation had either improved or worsened during the period of the trial court's jurisdiction.

■ We first address Mother's contention that the trial court erred in finding that she failed to provide for her children with appropriate care necessary for their development since the Juvenile Officer demonstrated that Mother was either physically or financially unable to do so. The trial court found that the evidence supported termination pursuant to subpart (d) of § 211.447.2(2), which requires the trial court to consider:

> [r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for his physical, mental, or emotional health and development.

As previously stated, Mother has had three different jobs while her children have been in foster care. Specifically, Mother worked from July to September, 1988 at St. Louis Temporaries. She also worked at Swiss American Import for one month, in September 1989. Additionally, from October to December, 1989, Mother worked at JCMF Industries. Moreover, Mother testified that she receives $498.00 per month from the Veteran's Administration. Despite employment, Mother has never made any support contribution on behalf of her children, except for occasional small gifts and treats for her children. Ironically, Mother testified that she spent $60.00 per day for drugs. Hospital records, however, indicate that Mother spent as much as $100.00 per day for cocaine.

Apart from Mother's drug addiction and the hospitalizations resulting therefrom, the record discloses no reason why Mother is incapable of holding a job or was physically unable to provide for her children. Mother can, therefore, be considered financially able to support her children. *R.L.P. v. R.M.W.*, 775 S.W.2d 167, 171 (Mo.App. 1989). Mother's contention is without merit.

■ Mother next contends that before Mother's adherence to a service plan can be considered, the plan itself must be reviewed. Section 211.447 does not require court approval of a social service plan as a factor under any ground for termination. *In re H.K.*, 762 S.W.2d 465, 469 (Mo.App. 1989). Although the plan is a factor to be considered by the court, failure to articulate approval does not require reversal. *Id.* Mother's contention is, therefore, without merit.

■ Mother next contends that, even if the plan were appropriate, Mother substantially complied with its terms. We disagree. As set forth above, Mother minimally complied with her plan. Mother missed seventeen scheduled visits with her three older children. Mother also missed twenty-seven visits with her two younger children. Mother never informed Schmaltz that she had obtained appropriate housing for herself and her children. Although Mother obtained psychological and psychiatric evaluations in 1987, she refused to obtain further evaluations in 1990. Mother had only three jobs between February 8, 1987 and trial. These jobs were for brief periods of time. Moreover, Mother failed both to complete a job training program and keep a monthly list of the places where she sought employment. Mother failed to provide a daycare plan for her children, although, arguably, this was not necessary since she failed to maintain employment. Mother never financially supported her children. Finally, Mother has only met with Schmaltz fourteen times despite her requirement to do so on a monthly basis. The fourteen occasions on which Mother did meet with Schmaltz, the appointments were at Schmaltz's request, not Mother's, as required by the plan. Thus, there was substantial evidence from which the trial

court could conclude that Mother failed to comply with the plan. Mother's contention that she complied with the plan is without merit.

■ Finally, Mother contends that § 211.447.2(3)(b) indicates that it is the success or failure of the Juvenile Officer, the Division, or other agency which is to be measured, not that of the parent. We disagree. That subsection which provides for findings as to:

> [t]he success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child; ...

merely requires the court to make findings as to the success or failure of the efforts of DFS based upon the evidence before it regarding those efforts. *In Interest of C.B.C.*, 810 S.W.2d 671, 674 (Mo.App.1991).

Here, the trial court found that DFS made reasonable efforts to fulfill its responsibilities under the plan. The trial court stated that: (1) Schmaltz was available to arrange visits each month upon Mother's request; (2) Schmaltz arranged for psychological and psychiatric evaluations for Mother; (3) Schmaltz reminded Mother, both orally and in writing to obtain proper housing, to continue her drug and alcohol counseling, to provide a daycare plan for her children, to set up and keep her monthly meetings with Schmaltz and to inform Schmaltz of any change in status. This is all that the statute requires the court to do. Moreover, the trial court's findings are supported by substantial evidence, are not against the weight of the evidence, and neither erroneously declare nor apply the law. Mother's second point is, therefore, denied.

Before addressing Mother's third point, we note that Mother's contention that the evidence does not show that Mother's condition had either improved or worsened during the period of the trial court's jurisdiction fails to state a claim upon which relief can be granted. There is no statutory requirement that DFS establish this during the presentation of its evidence.

■ Mother's third point is that the trial court erred in terminating her parental rights with regard to her five children, because there was no substantial evidence to support the trial court's finding that there was not an emotional bond between Mother and her children. A thorough review of the record indicates that the children lack emotional ties to Mother. Specifically, Schmaltz testified that when Mother failed to show for visits, all five children would curse about Mother. F.L.M. would get very angry and would go and sit in a corner. T.S.W. would become very "smartalecky". M.S.M. would feed into what T.S.W. was doing, and would argue and throw things. C.D.W. would start beating up his siblings and Schmaltz. He would also scream, yell and throw things. Often times, Schmaltz would have to physically restrain him. B.M.W. would cry, sit independently and play by himself.

C.D.W. told Schmaltz that he was angry and wanted to tell Mother how he felt. He wondered if he had done something which would cause Mother not to show up. B.M.W. told Schmaltz: "I'm tired of doing this. Don't make me come to the office if this lady isn't going to show up." F.L.M. was concerned about Mother. When Mother failed to show for scheduled visits, he wondered whether something happened to Mother. F.L.M. also inquired whether he had to continue visiting with Mother, since she would not show up. M.S.M. discussed how Mother hurt her feelings and how angry she was at Mother. M.S.M. expressed that her anger was based on the fact that she knew Mother was abusing drugs, and that was the reason why Mother never cared about her children or visited them. T.S.W. blamed the other children for Mother's failure to show up for scheduled visits. As she grew, she expressed that she did not want to see her Mother. T.S.W. stated that she did not trust Mother, like Mother and that Mother was not a nice person. T.S.W. also stated that Mother failed to protect her.

■ Schmaltz did say that the children wanted to see Mother. She also testified

that the children are disappointed when they do not get to see Mother. Additionally, Schmaltz stated that there is some bonding between Mother and her children. This, however, is not enough to indicate that the trial court erred in terminating Mother's parental rights. Mother repeatedly failed to meet with her children. Even if there is some bonding between Mother and her children, a mother's lack of interest and commitment to a child who is bonded with the mother is considered more egregious than an abandonment of a child who is not emotionally bonded to the parent. *In Interest of Y.M.H.*, 817 S.W.2d 279, 284 (Mo.App.1991). The shallow emotional tie the children may experience with their mother is considered, but taken by itself, is insufficient to warrant reversal of the trial court's decision. *In Interest of M.S.*, 830 S.W.2d 540, 545 (Mo.App.1992). Mother's third point is, therefore, denied.

 Mother's fourth point is that the trial court erred in failing to grant Mother a continuance at the commencement of trial because such refusal denied Mother her due process rights. The denial of a request for a continuance rarely is reversible error. *In Interest of S.___G.*, 779 S.W.2d 45, 51 (Mo.App.1989). The trial court, however, neither enjoys an absolute nor an arbitrary discretion, and the trial court's decision will be reversed if there has been an abuse of discretion. *Id.*

In the case at bar, Mother's attorney, Richard J. Eisen, stated Mother failed to appear at a meeting with him, refused to come to his office and insisted that she had her own personal attorney. Eisen confirmed that Mother had sought independent counsel, but Mother also failed to keep her appointment with this attorney. Eisen was Mother's appointed attorney for a period of over two months. The trial court cannot, nor is it legally authorized to, physically force a parent to meet with counsel. Parents must make a commitment to regaining their childrens' custody. Mother's failure to obtain an attorney's services is a further indication of Mother's superficial attempt to obtain their custody.

Moreover, the trial court did ask Mother if she wanted to proceed on her own or with Eisen's help. Mother requested Eisen's aid. The cause, thereafter, proceeded to trial. Eisen's performance was commendable. He adequately cross-examined witnesses and presented Mother's case as favorably as was possible.

The circumstances of a particular case hold great weight in determining whether an indigent parent was unjustly denied the right to counsel in termination of parent rights proceedings. *B.L.E. v. Elmore*, 723 S.W.2d 917, 920 (Mo.App.1987). Mother was not denied due process; she rejected it by failing to keep her appointments to meet with Eisen prior to the hearing. The trial court's refusal to grant a continuance was not error.

For the reasons stated above, the trial court's decision is affirmed.

PUDLOWSKI, P.J., and CRIST, J., concur.