In the Interest of K.D.C.R.C.B–T., A Minor.

No. 69483.

Missouri Court of Appeals,
Eastern District,
Division One.

Sept. 17, 1996.

David W. Terry, Limbaugh & Payne, Cape Girardeau, for Appellant William Tuttle.

Julie Taylor, John A. Layton, Vocel & Layton, Cape Girardeau, for appellant.

Chris N. Weiss, Lichtenegger, Payne, Weiss, Hahn & Fetterhoff, L.L.C., Jackson, for respondent.

GARY M. GAERTNER, Judge.

In this consolidated appeal, appellants, L.B. ("mother") and W.T. ("father"), appeal the judgment of the Circuit Court of Cape Girardeau County terminating their parental rights to K.D.C.R.C.B-T. ("child") pursuant to RSMo § 211.447.2(2) (1994).[1] We affirm in part and remand in part.

Mother and father are the natural parents of child, a girl. Child was born on August 17, 1994, and was taken into custody by the Division of Family Services ("DFS") two days later because mother was delusional. Mother had stated to nurses that "Asian Indians" in a yellow van had been stalking her and were going to steal her baby. Mother also believed she had delivered twins.

Within a few days of mother's return home after child's birth, DFS social workers visited her in order to discuss the procedures mother would have to follow to regain custody of child.[2] Pamela Cannon, one of the social workers, testified at the termination proceeding. She testified mother was very "erratic" when they made the initial visit and was very difficult to talk to. At this meeting mother again made reference to a "missing twin" and the "Asian Indians." As a result of this meeting, DFS contacted the Department of Mental Health who sent a staff member to see mother. Though mother was not initially hospitalized, she was involuntarily committed to Doctors Regional Hospital in Poplar Bluff within two weeks of the initial visit, after Department of Mental Health staff found her to be "very aggressive" and "very threatening." From there she was released to Mary's Ranch, a supervised residence for people with mental disabilities. Mother still resided there on the date of the termination proceeding, October 3, 1995.[3]

Dr. Daniel Levin, a psychologist at Professional Mental Health, performed a general psychological evaluation on mother on December 28, 1994, and also testified at the hearing. He diagnosed her as suffering chronic schizophrenia, which is characterized by loss of contact with reality, disorientation, and emotional instability. He found mother had a distorted sense of self and was self-absorbed, leaving "many questions" about her ability to form healthy relationships, to have empathy for others, and to form boundaries between herself and other individuals. Dr. Levin believed mother's inability to empathize was an "extensively harmful implication" for a child dependent upon her. He also stated the first step to recovery was recognizing one was ill and that, despite a twenty-three year history of mental illness,[4] mother did not believe anything was wrong with her. Lastly, though he stated he would not make his diagnosis of chronic schizophre-

---

1. All statutory references will be to RSMo 1994 unless otherwise noted.

2. Mother and father were not married, though they did live together for a time before child's birth.

3. DFS filed its petition to terminate mother's and father's parental rights on August 1, 1995. The petition alleged child was neglected by reason of each parent's mental condition, namely mother's paranoia schizophrenia and father's bipolar affective disorder, which left mother and father unable to knowingly provide child with the necessary care, custody, and control, and which conditions were permanent or not likely to be reversed. RSMo § 211.447.2(2)(a). The petition also alleged father's rights should be terminated as child was neglected by reason of father's chemical dependency which could not be treated. RSMo § 211.447.2(2)(b).

4. Dr. Levin stated he believed mother had been ill since she was 14 years old.

nia definitive without reviewing mother's past medical history, he testified it would take mother "many, many years under the best of circumstances" to make progress, and that "real limits" existed as to her ability to become well enough to care for her child. He expressed his belief that mother could not care for child in mother's condition.

Mother testified on her own behalf. She denied suffering any illness and characterized Dr. Levin's testimony as "nothing but a lie." When questioned about her ability to have a child live with her at Mary's Ranch, mother recognized children were not allowed where she currently lived, and she would have to attain independent living status in order for child to reside with her. When further questioned about what she needed to do to meet the independent living criteria or what she would have to do to maintain that status, she replied she "just hope[d] to be out soon."

Also entered into evidence were mother's past medical records cataloguing her admittances and treatments at various hospitals and mental health facilities beginning in 1979. The records revealed mother was consistently diagnosed as suffering paranoia schizophrenia, thus substantiating Dr. Levin's preliminary assessment and diagnosis. The various acts and circumstances leading up to and resulting in mother's numerous hospitalizations included drawing a knife on her brother, attempting to choke her mother, alleging someone put voodoo curses on her, voicing fears about ghosts, having hallucinations, and displaying bizarre and threatening behavior in the community.[5] Mother's records also revealed her repeated failure to take her medication when not supervised or hospitalized.

Also admitted into evidence were the records from the probate division of the Circuit Court of Gasconade County showing mother had been declared incapacitated by reason of her mental illness, and a guardian and conservator had been appointed for her in 1990. Mother was still under a guardianship/conservatorship on the date of the hearing.

With respect to evidence supporting the termination of father's parental rights, the evidence revealed father suffered from a serious psychiatric disorder, previously diagnosed as bipolar affective disorder (manic-depressive illness). Dr. James Powers, a clinical psychologist with Professional Mental Health, assessed father's parenting ability on August 30, 1995. Dr. Powers found father to be an isolated individual having difficulty with social boundaries—particularly with sexual boundaries—and in accurately perceiving reality. Father had a history of alcohol and substance abuse, behavior in which he still "periodically" engaged, according to Dr. Powers. The testing also indicated potential trouble with father's ability to accept child's expression of age-appropriate behaviors. While father expressed some interest in child, Dr. Powers found father maintained the relationship in part to meet some of his own needs, rather than maintaining the relationship out of his concern for child's welfare. As a result of his examination, Dr. Powers believed father could not meet child's basic needs, and would not be able to so long as his condition remained the same. His prognosis for father's ability to improve was poor.

Ms. Cannon also testified with respect to father. She stated he told her he did not want custody of child, though he exercised visitation with her one hour a month on a fairly consistent basis. Ms. Cannon believed father's visitation was acceptable as long as it was supervised. Ultimately, however, Ms. Cannon recommended terminating both mother's and father's parental rights.

Steve Essner, the supervisor of the Community Psychiatric Rehabilitation Program at the Community Counseling Center, also testified at the hearing. He worked with father and others with serious and persistent mental illnesses to attain housing, vocational, educational, and social goals. At the time father joined the program in 1990, he was evaluated and diagnosed with bipolar affective disorder. He was abusing alcohol, marijuana and cocaine, which exacerbated his mental illness. Mr. Essner testified father

---

**5.** Mother had been removed from a supervised living facility for starting grease fires and putting out cigarettes on towels.

received help weekly in a variety of aspects, from maintaining a home, to getting a job, to handling finances, to taking medication. He stated father's diagnosis had not changed since his initial evaluation and father was dealing with the same issues at the time of the hearing as he was when he first came to the Center. At one point, a guardianship was discussed.

Mr. Essner also spoke of the unsanitary condition of father's and mother's home, noting they housed at least three pets that urinated and defecated on the floor indoors. While Mr. Essner thought father's visitation with child was acceptable, he added the caveat that that was the case as long as father was not "delusional" or displaying any "psychiatric symptoms." Mr. Essner testified to his belief that father's condition was chronic, existing for the past ten years, and that it would continue to require medication in the future.

Father testified on his own behalf. He characterized his illness as a "sleep disorder" for which he takes Thorazine daily.[6] He also stated he did not believe alcohol use had a detrimental effect on his life, despite Dr. Powers' testimony that father could not improve his condition until he quit drinking and abusing drugs. When questioned about various alcohol and substance abuse programs, father admitted he attended at least two different programs but quit them both because he did not feel they were helping him. Father admitted he still drank alcohol, an average of "three beers a night," and had a "real moderate" problem with controlled substances, using "once a week or where I can afford it...."

Father's past medical records, though not as voluminous as mother's, were also entered into evidence. They chronicled father's mental problems which began in 1982, and included paranoia, irrational acts, mood swings, and delusions, as well as alcohol and drug abuse.

A court appointed special advocate spoke at the conclusion of the hearing. He had been involved with the situation and had contact with all the parties since child had been taken into DFS custody. He believed a family plan and future unification of the family was not possible under the circumstances and recommended termination. The court terminated the parents' rights, finding child was neglected by reason of each parent's respective mental condition.[7] Both mother and father appeal the trial court's findings.

■■■ In a termination proceeding, the best interest of the child is the main concern. *In Interest of M.L.W.*, 788 S.W.2d 759, 762 (Mo.App. W.D.1990). The state must present clear, cogent, and convincing evidence supporting its case. *Id.* Due regard is given to the trial court's judgment on credibility. *In the Interest of M.E.W.*, 729 S.W.2d 194, 195 (Mo.banc 1987). We will affirm the trial court's decree unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. *Id.* at 195–96. When the record contains conflicting evidence, we view it in the light most favorable to the judgment. *Id.* at 196.

### I. Mother's Appeal

Mother presents three points on appeal. The first two arguments challenge the sufficiency of the evidence to terminate her rights. While we believe these points are without merit, we decline to address them as mother's third point is dispositive of her appeal.

■■■ Mother's last point asserts, and the respondent-state concedes, the trial court erred in its failure to enter findings with respect to the factors enumerated in RSMo § 211.447.2(2)(b)–(d). We agree the trial court's oversight was error, and remand so that it may enter the proper findings with

---

6. Thorazine is a drug used to control mania.

7. Under RSMo 211.447.2(2)(a), a parent's rights may be terminated when (1) the child has been found to be neglected by reason of the parent's mental condition which is shown by competent evidence either to be permanent or such that

there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control[,] and (2) the termination is in the child's best interest.

respect to those subparagraphs, as required by RSMo § 211.447.2.[8] *See In Interest of S.C.,* 914 S.W.2d 408, 411–12 (Mo.App. W.D. 1996); *In re Interest of E.K.,* 860 S.W.2d 797, 799 (Mo.App. E.D.1993); *In Interest of J.M.,* 789 S.W.2d 818, 822 (Mo.App. W.D.1990).

## II. Father's Appeal

■ Father's first point on appeal challenges the sufficiency of the evidence concerning father's mental condition. We reiterate the evidence is viewed in the light favorable to the judgment. *M.E.W.,* 729 S.W.2d at 196. The evidence revealed father suffered from bipolar affective disorder. Dr. Powers characterized father as suffering from a "serious psychiatric disorder" which made it difficult for him to recognize social boundaries, particularly in the context of sexual situations. Dr. Powers' tests revealed father would have difficulty accepting child's expression of age-appropriate behaviors, and Dr. Powers further concluded father could not meet child's basic needs. He also reported father's use of alcohol and illegal substances had a detrimental effect on father's disorder. When questioned about father's ability to improve his condition, Dr. Powers testified father's prognosis was poor.

Steve Essner testified father's diagnosis had remained the same for the past five years, and that, despite weekly help in numerous areas of life, father was still dealing with the same issues. At one point, a guardianship for father was discussed. Mr. Essner believed father's visitation with child was acceptable so long as father was not "delusional" or displaying "psychiatric symptoms," thus indicating father's mental condition was not always stable. Lastly, Mr. Essner testified father's condition was chronic, explaining it had existed for the past ten years, and he would likely require medication to help control it in the future.

Father's medical records were consistent with both Dr. Power's and Mr. Essner's testimony, and all three taken together constituted sufficient evidence that father had a mental condition and there was no reason-able likelihood it could be reversed rendering him unable to care for child. *See In Interest of B.J.D.B. v. J.B.G.,* 698 S.W.2d 328, 332 (Mo.App. W.D.1985).

Father's second point contends the trial court committed error when it terminated father's rights due to his chemical dependency, RSMo § 211.447.2(2)(b), because the evidence was insufficient to support that ground. Under RSMo § 211.447.2(2), the existence of any one of the four enumerated conditions, subparagraphs (a)–(d), suffices to terminate a parent's rights. *R.L.P. v. R.M.W.,* 775 S.W.2d 167, 171 (Mo.App. E.D. 1989). Therefore, as we have previously found the evidence supported the termination of father's rights on the ground of mental condition, we find father's second point moot.

■ In his third point on appeal, father argues the trial court's termination of his rights was erroneous because the evidence failed to prove such action was in child's best interest. We disagree. In Missouri, the "best interest of the child" means the parent's ability to provide the child with a permanent home. *J.H.H. v. J.D.,* 662 S.W.2d 893, 895 (Mo.App. E.D.1983). While father expressed some interest in child by exercising periodic visitation, he expressly informed Ms. Cannon, the DFS worker, he did not want custody of child. Further, the trial court found no bonding had occurred between child and father as result of these visits. The evidence also showed father could not, even if he had the desire, provide child with a stable home. Expert testimony revealed father's disorder hampered his ability to function in all areas of life. Mr. Essner testified father received frequent help addressing various life issues, and that despite this help, father had not progressed. Mr. Essner also gave details about the poor sanitary condition of mother and father's home. Both Dr. Powers and Mr. Essner testified as to father's inability to care for child. Thus, ample evidence supported the trial court's finding that termination of father's rights was in child's best interest.

---

8. While not raised by appellant on appeal, we note the trial court's findings with respect to RSMo § 211.447.2(2)(a) could also be deemed deficient, which deficiency should also be cured on remand.

Father's last point on appeal contends the trial court erred in terminating father's rights instead of retaining jurisdiction over child as allowed under RSMo § 211.477.4. As we have found termination under RSMo § 211.447.2(2) was supported by the evidence, father's fourth point is moot and we decline to further address it.

Based on the foregoing, the judgment of the trial court terminating mother's parental rights is remanded with directions to enter findings required by RSMo § 211.447.2(2), and the judgment of the trial court terminating father's parental rights is affirmed.

DOWD, P.J., and REINHARD, J., concur.